IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,111

STATE OF KANSAS,
*Appellant*,

v.

FREDDIE ALEC THOMAS,
*Appellee.*

SYLLABUS BY THE COURT

1.

Probable cause is the standard used to decide whether a defendant is entitled to immunity from criminal prosecution under K.S.A. 2019 Supp. 21-5231, which is the statute broadly encompassing justifications for using force to defend people or property. The State bears the burden to establish probable cause that defendant's use of force was not statutorily justified when a defendant invokes the statute.

2.

For purposes of K.S.A. 2019 Supp. 21-5231, the State establishes the probable cause necessary to defeat a pretrial motion for immunity if the district court's factual findings are sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt despite the defendant's claim of justified use-of-force immunity.

3.

To decide a defendant's motion for immunity from criminal prosecution under K.S.A. 2019 Supp. 21-5231, a district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine

1

whether the State carried its burden to establish probable cause that defendant's use of force was not statutorily justified.

4.

A district court's probable cause determination under K.S.A. 2019 Supp. 21-5231 must be premised on: (a) stipulations of the parties, evidence received at a hearing under the rules of evidence, or both; and (b) the reasonable inferences to be drawn from any stipulations or the evidence.

5.

The process envisioned by K.S.A. 2019 Supp. 21-5231 for determining whether the State met its burden of establishing probable cause will usually require a district court to hear and resolve conflicting evidence when making its factual findings. The district court's legal conclusions in deciding whether the State established probable cause must be supported by those factual findings.

6.

Under K.S.A. 2019 Supp. 21-5231, the State can defeat a pretrial motion for immunity by establishing probable cause that the defendant's use of force was not justified in accordance with K.S.A. 2019 Supp. 21-5222 under either or both of two scenarios: (a) the defendant did not honestly believe the use of force was necessary under the circumstances, or (b) a reasonable person would not believe the use of force was necessary under the circumstances.

7.

Under K.S.A. 2019 Supp. 21-5231, the State can defeat a pretrial motion for immunity by establishing probable cause that the defendant was engaged in a forcible felony or initially provoked the use of force under the conditions set out in K.S.A. 2019 Supp. 21-5226(b) or (c).

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 8, 2017. Appeal from Barton District Court; RON SVATY, judge. Opinion filed April 24, 2020. Judgment of the Court of Appeals reversing the district court and remanding the case is affirmed. Judgment of the district court is reversed and the case is remanded with directions.

*Douglas A. Matthews*, assistant county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellant.

*Donald E. Anderson II*, of Law Office of Donald E. Anderson II, LLC, of Great Bend, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Freddie Alec Thomas shot and killed an unarmed man during an incident outside that man's residence. The State charged Thomas with first-degree murder. The district court granted Thomas' pretrial motion to dismiss based on self-defense immunity. A Court of Appeals panel reversed and remanded the case for another evidentiary hearing after concluding the district court failed to make sufficient findings of fact and conclusions of law. *State v. Thomas*, No. 116,111, 2017 WL 6064660, at \*13-14 (Kan. App. 2017) (unpublished opinion). Thomas challenges the panel's judgment. We affirm the panel.

## FACTUAL AND PROCEDURAL BACKGROUND

Thomas and his girlfriend, Sherry Muro, visited Muro's daughter, Marissa Reynolds, at Reynolds' home. At one time Muro lived at the house with her previous boyfriend, Jeremy Saldana, but she had since moved out. Muro did not know Saldana continued to live there.

Saldana did not care to see Muro or Thomas, so he left before they arrived. Later that evening, Saldana texted Reynolds to see if she could ask the couple to leave so he could come home. Reynolds asked her mother and Thomas to leave. Muro was shocked to learn Saldana was still living with her daughter. Muro testified her daughter "told me that she was texting [Saldana], that he was over in the park and that he was going to come and start some shit with Mr. Thomas." Thomas had heard about Saldana from Muro but had never met him. Reynolds said Thomas was "a little upset."

Thomas worked at the Ellsworth Correctional Facility and always carried a nine-millimeter handgun on his person, including that night. After learning Saldana was returning, Thomas went to his truck and put on the ballistic vest he wore at work. It is undisputed Thomas and Saldana confronted each other shortly after that. Thomas killed Saldana by shooting him three times. Witness accounts conflicted about what happened.

The State charged Thomas with first-degree premeditated murder under K.S.A. 2019 Supp. 21-5402(a)(1). After the preliminary hearing, Thomas moved to dismiss based on self-defense immunity under K.S.A. 2019 Supp. 21-5231. In response, the State argued Thomas did not qualify for statutory immunity because his use of deadly force was not justified under K.S.A. 2019 Supp. 21-5222 and because Thomas was the initial aggressor under K.S.A. 2019 Supp. 21-5226.

At an evidentiary hearing on the immunity claim, Detective Sergeant David Paden from the Barton County Sheriff's Office testified about his two interviews with Thomas. Reynolds and Muro also testified. The district court admitted the autopsy report into evidence. Thomas did not testify.

According to Paden, Thomas said he believed from conversations with Muro that Saldana was a violent man who typically carried weapons. Thomas said he was standing

4

by his truck when Saldana walked up. Someone said, "[H]ere he is, look at him, look at him," and when Thomas turned, Saldana was in front of him. Thomas asked Saldana, "What's the problem?" Saldana gave an unintelligible response but "kept coming at" Thomas.

Thomas told Paden he performed what he described as a "clearing maneuver," which is taught in law enforcement training as a self-defense technique to separate an officer from an assailant. He said there was no scuffle or fight aside from that. Thomas said he fired the first shot by accident. He explained the second and third shots by claiming he felt threatened because Saldana "kept coming at him." He suggested he was concerned about his safety and the safety of others. He said he did not know if Saldana would go inside the house or do anything to anyone else. Thomas acknowledged he never saw Saldana with a weapon.

On cross-examination, defense counsel asked Paden if it would "be objectively unreasonable at that point if somebody was coming at you to pull your weapon and fire it?" Paden responded, "Depending on the circumstances. There's a lot of things you have to take into consideration. The size of the person, their demeanor. It just kind of depends. I couldn't say one way or another for sure what one officer might find life threatening and another one might not."

In redirect, the following exchange occurred with the prosecutor:

"Q. [Prosecutor:] . . . [T]aking into consideration what you have already spoken about regarding training and experience, what does your training tell you about the employment of deadly force against somebody who is perhaps just using force?

"A. [Paden:] Like I said, you have to take the whole situation at hand. I don't know that drawing his weapon was a wrong act. The information that he had had before

5

with the fact that Saldana was a violent man, always carried a weapon, you have to take that into consideration. I don't know that him drawing the weapon was a wrong act.

"Q. [Prosecutor:] What about firing the weapon?

"A. [Paden:] That I said that was kind of have to be—I would have to be there in that situation to determine whether I would fire or not."

Reynolds described the incident at her home differently. She testified Thomas "was asking what [Saldana] looked like" before Thomas and Muro got into Thomas' truck to leave. And when Saldana appeared, Thomas turned the truck engine off. He then left the vehicle to walk over and "cut [Saldana] off" as Saldana walked through the yard. Their conversation, according to Reynolds, was Thomas asking Saldana, "Do you have a beef with me?" before grabbing Saldana by the throat. She testified Saldana "tried to get away but could not do so. . . . He was trying to shove Mr. Thomas away so that he could get away." Saldana violently swung Thomas around before Thomas stepped back and shot Saldana three times.

Muro testified she had harsh words with Saldana at some point before the incident. She said, "Mr. Saldana had threatened me that I was nothing but a dirty nigger lover, and that's all I said to [Thomas]." Muro told Thomas about threats Saldana made about Thomas: "[Saldana] said he was going to kick [Thomas'] black ass."

As for the shooting, Muro said she and Thomas were never both in the vehicle with the key in the ignition and never drove away. In her version, Thomas stood by the house's porch—not by his truck—when Saldana confronted him. She said Saldana pushed Thomas before asking, "[Y]ou got a fucking problem with me?" Thomas replied, "I don't even know you." Muro testified she stepped between them to try to stop a fight. But Saldana "kept coming," at which point Thomas drew his gun and fired. Muro said the

6

gunshots caused her ears to ring because she was "almost beside" Thomas when he fired. Muro's perception was that Saldana continued moving toward Thomas aggressively after the first shot and Thomas continued firing.

Dr. Lyle Noordhoek performed the autopsy. His report showed Saldana suffered two gunshot wounds to the chest and another near the left ear. And based on the wounds' locations and paths through Saldana's body, he concluded Saldana appeared to have been moving forward at the time of the second shot and was leaned forward at the time of the third.

When the hearing ended, the district court made no distinct factual findings. It simply held the State did not meet its burden to show probable cause that self-defense immunity did not apply and dismissed the complaint. The court reasoned,

"I think this is a pretty hard burden for the State in any case to do probable cause, but I think in this case, it was especially hard, because contrary to the State's argument that putting on a vest is somehow an affirmative action for going after somebody, in this case particularly, it showed that the defendant was—sincerely and honestly believed the use of deadly force was necessary because he had a gun on from the time he went to visit his wife's—or his girlfriend's family. He wore it all the time. The only thing he goes to the car for is the bulletproof vest, which is not an affirmative action to go do something to somebody else. It's an action to defend yourself. Now so the subjective test I don't think the State could overcome.

"Frankly, as I was listening to the evidence, I thought, well, the State's going to be able to prove the second issue or at least on probable cause the second part of the test is objective and requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force was necessary to defend himself, and I was—all along, until the last State's witness, I was getting ready—I hadn't heard anything that would indicate that they hadn't met that, but then Officer David

7

Paden's testimony on direct examination by the State's attorney said he was of the opinion that, at the time, the defendant was justified in drawing his weapon. That was his direct testimony. If you're justified in drawing your weapon, that's an objective test. That's what the officer—that's what a police officer thought, the police officer that investigated the case. Well, if he's justified in drawing his weapon, an objective person would think that he's justified in firing it, because if you're justified in drawing it, you're justified in using it. That's the reason I'm granting it. I might get overturned. I probably will. I don't know. This is a strange statute."

The State timely appealed. A Court of Appeals panel reversed and remanded for a rehearing, noting the judge who presided over the first hearing had retired. *Thomas*, 2017 WL 6064660, at *13-14 ("Under these unique circumstances, and given the fact-intensive inquiry of self-defense immunity motions, and the importance of credibility determinations in fact-finding, the district judge assigned [to] this case shall conduct another evidentiary hearing on Thomas' motion, and make the requisite findings of fact and conclusions of law.").

This court granted Thomas' timely petition for review. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petition for review of Court of Appeals decision); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

SELF-DEFENSE IMMUNITY

Thomas argues the State failed to establish probable cause that the use of deadly force was not justified and claims the panel simply did not accept that legal reality. But the panel's decision is more nuanced. It held the district court did not do what it was supposed to do: decide the case by considering the totality of the circumstances, weighing the evidence without deference to the State, and then determining if the State

8

met its burden to establish probable cause. *Thomas*, 2017 WL 6064660, at *5-8 ("At the outset, our review of the district court's ruling at the conclusion of the evidence and later filed journal entry, reveals the district court made *no findings* regarding any of the facts presented at the evidentiary hearing.").

This failure was especially acute in the panel's view with the State's assertion that Thomas initially provoked the use of force against himself. The panel noted considerable disputed evidence it believed was critical to a proper resolution of the self-defense issue that was not judicially determined. It remanded the case for compliance with Supreme Court Rule 165 (2019 Kan. S. Ct. R. 221). That rule imposes on the district court the primary duty to provide adequate findings of fact and conclusions of law on the record to explain the court's decision on contested matters. *Thomas*, 2017 WL 6064660, at *8-9.

As it comes to us, this case presents not only a fact-intensive self-defense question, but an opportunity to better describe a district court's role in deciding these complex immunity claims before trial. And the specific question here is whether the district court did enough to permit appellate review of the applicable self-defense probable cause determinations. That review applies a bifurcated standard in which factual findings arising from disputed evidence are reviewed for substantial competent evidence, and the ultimate legal conclusion drawn from those facts is reviewed de novo. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017). In this case, that standard of appellate review applies to the parties' arguments advanced under both K.S.A. 2019 Supp. 21-5231 (immunity) and K.S.A. 2019 Supp. 21-5226 (initial provocation).

In *State v. Collins*, 311 Kan. __, __ P.3d __ (No. 117,743, this day decided), we explained:

"The process envisioned by K.S.A. 2019 Supp. 21-5231 for determining whether the State met its burden of establishing probable cause will usually require a district court to hear and resolve conflicting evidence when making its factual findings. The district court's legal conclusions in deciding whether the State established probable cause must be supported by those factual findings." Syl. ¶ 5.

We begin with the applicable law. The immunity statute, K.S.A. 2019 Supp. 21-5231, provides:

"(a) A person who uses force which, subject to the provisions of K.S.A. 2019 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2019 Supp. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

. . . .

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause."

The statutory justification in Thomas' case is set out in K.S.A. 2019 Supp. 21-5222:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

10

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

Our initial focus is on subsection (b) because it extends the self-defense justification in subsection (a) to circumstances in which a person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to that person or a third person. This is what Thomas claims happened.

In a case involving the use of deadly force in defense of a person, there is a two-prong test to determine if the defendant's conduct was justified under the self-defense statute. The first is subjective. It requires a showing that the defendant sincerely believed it was necessary to kill to prevent imminent death or great bodily harm to the defendant or a third person. The second is objective and requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary to prevent imminent death or great bodily harm to the defendant or a third person. *State v. Macomber*, 309 Kan. 907, 916-17, 441 P.3d 479 (2019).

Also pertinent are K.S.A. 2019 Supp. 21-5226(b) and (c). These subsections provide that a self-defense justification is unavailable to a person who:

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

11

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

Both subsections (b) and (c) articulate separate grounds for denying self-defense immunity when a person "initially provokes the use of any force against such person or another." Subsection (b) requires the additional element that the initial provocation be done "with intent to use such force as an excuse to inflict bodily harm upon the assailant." Subsection (c) contains a retreat "safe harbor" available to an initial aggressor who lacks the additional element required in subsection (b). See *State v. Beltz*, 305 Kan. 773, 781-82, 388 P.3d 93 (2017) (determining "the retreat safe harbor exceptions . . . are only available to a defendant falling under subsection [c]").

Thomas does not claim the retreat safe harbor exceptions under subsection (c) apply, so our issue here is based only on subsection (b). This means the district court needed to decide as a part of its self-defense immunity ruling whether the State established probable cause for the two elements required by K.S.A. 2019 Supp. 21-5226(b): (1) Thomas initially provoked the use of force against himself, and (2) he did so with the intent to use such force as an excuse to inflict bodily harm on Saldana. And if the State showed probable cause that Thomas was not justified in killing Saldana because he initially provoked the violence as set out in subsection (b), it would not be necessary to consider the two-part subjective and objective test under K.S.A. 2019 Supp. 21-5222.

12

See *State v. Salary*, 301 Kan. 586, 594, 343 P.3d 1165 (2015) (jury instruction case; addressing application of K.S.A. 21-3214(3) [now at K.S.A. 2019 Supp. 21-5226(c)] first before conducting the two-prong test under the self-defense statute because subsection [3]'s operation was "dispositive").

In *Hardy*, we noted the self-defense statutory scheme confers a "true immunity" for those who qualify. This, the *Hardy* court continued, means the law carries with it "the necessity of a procedural gatekeeping function, typically exercised by a detached magistrate, who will prevent certain cases from ever getting to a trial and a jury." 305 Kan. at 1010. And that gatekeeping is triggered by a defendant's pretrial motion to invoke immunity under K.S.A. 2019 Supp. 21-5231.

Such motions impose on the State the burden to come forward with probable cause to show defendant's use of force was not statutorily justified. *Hardy*, 305 Kan. at 1011. To meet its probable cause burden under K.S.A. 2019 Supp. 21-5231, the State may establish that an ordinarily prudent and cautious person could reasonably believe defendant's use of force was not justified under either or both of two scenarios: (1) the defendant did not honestly believe the use of force was necessary under the circumstances, or (2) a reasonable person would not believe the use of force was necessary under the circumstances. See K.S.A. 2019 Supp. 21-5222. And in Thomas' case, another way to defeat his immunity motion would be to demonstrate, as the State tries to do here, probable cause that the use of force was not justified because Thomas initially provoked the use of force under the conditions set out in K.S.A. 2019 Supp. 21-5226. See *Collins*, 311 Kan. at __, slip op. at 20-21 (holding self-defense immunity unavailable to defendant when facts as found by the district court demonstrated probable cause to believe defendant was engaged in a forcible felony).

13

The State's probable cause burden required by K.S.A. 2019 Supp. 21-5231 is substantially less than the proof beyond a reasonable doubt required to obtain a guilty verdict. Probable cause simply means that the district court's factual findings are sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of defendant's guilt despite the defendant's claim of justified use-of-force immunity. See *Collins*, 311 Kan. at __, slip op. at 11-12; *Hardy*, 305 Kan. at 1011 (holding State must establish probable cause that use of force was not statutorily justified to overcome motion for immunity under K.S.A. 2016 Supp. 21-5231); *State v. Ultreras*, 296 Kan. 828, 846, 295 P.3d 1020 (2013) (holding State defeated immunity motion because it "offered evidence sufficient for a person of 'ordinary prudence and caution to conscientiously entertain a reasonable belief' of [defendant's] guilt despite his claim of justified use-of-force immunity"); *State v. Washington*, 293 Kan. 732, 733-34, 268 P.3d 475 (2012) (noting probable cause to bind a defendant over for trial "'signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt'").

To decide these motions, a district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and then determine whether the State carried its burden. *Hardy*, 305 Kan. at 1011. Probable cause determinations under K.S.A. 2019 Supp. 21-5231 must be premised on: (1) stipulations of the parties or evidence received at a hearing under the rules of evidence, or both; and (2) the reasonable inferences drawn from any stipulations or the evidence. And as the *Hardy* court observed, the district court usually is squarely tasked with resolving conflicts in the evidence in these contentious self-defense cases before it can apply the legal principles set out in our law. 305 Kan. at 1011-12.

The district court should use a two-step process in making its probable cause determinations under K.S.A. 2019 Supp. 21-5231. First, the district court must make its

factual findings, which may require resolving conflicts in the evidence. Second, it must reach legal conclusions as to whether the State met its probable cause burden based on those factual findings. *Collins*, 311 Kan. at __, slip op. at 10.

Under *Hardy*, the highly disputed facts presented at Thomas' hearing required judicial resolution by weighing the evidence and drawing reasonable inferences from it before reaching any legal conclusions about the possible application of K.S.A. 2019 Supp. 21-5222(b) and K.S.A. 2019 Supp. 21-5226(b). The district court's fleeting explanation of its conclusions—without first adequately addressing the contradictory testimony—was error.

For example, the *Thomas* panel emphasized four obvious factual disputes about the moments immediately preceding the shooting that were not addressed by the district court: (1) whether Thomas stopped his vehicle, got out, and approached Saldana or whether Saldana approached him; (2) the nature of any physical contact between the men before Thomas fired a shot; (3) the content of any verbal exchange, including fighting words, which may have occurred between Thomas and Saldana; and (4) whether the first shot was accidental, an intentional hit, or intended as a warning shot. *Thomas*, 2017 WL 6064660, at *8. These determinations are especially pertinent to the State's contention under K.S.A. 2019 Supp. 21-5226(b) that Thomas was the initial aggressor, because under some versions of the testimony he was already armed, had donned his ballistic vest before Saldana arrived, refused to leave the area when given an opportunity, and reentered the yard to approach Saldana. And these findings are similarly critical to resolving whether there were subjective and objective bases for Thomas to have a reasonable belief about the need to use deadly force to prevent imminent death or great bodily harm under the self-defense statute.

15

The district court seemingly brushed aside these conflicts by seizing on Detective Paden's testimony that the officer could not say Thomas committed "a wrong act" by drawing his weapon. It concluded: "Well, if he's justified in drawing his weapon, an objective person would think that he's justified in firing it, *because if you're justified in drawing it, you're justified in using it*." (Emphasis added.) But firing one's weapon need not inevitably follow the act of drawing it, either factually or legally.

The panel correctly held an individual who might be justified in drawing a deadly weapon would not necessarily be justified in firing it as a conclusion of law. *Thomas*, 2017 WL 6064660, at *13. K.S.A. 2019 Supp. 21-5222 distinguishes between "use of force" and "use of deadly force," and K.S.A. 2019 Supp. 21-5221(a) provides their definitions. See K.S.A. 2019 Supp. 21-5221(a)(1)(B) ("'Use of force' means . . . the presentation or display of the means of force."); K.S.A. 2019 Supp. 21-5221(a)(2) ("'Use of deadly force' means the application of any physical force described in paragraph [1] which is likely to cause death or great bodily harm to a person."). These statutory definitions clarify that "use of deadly force" does not include "[a]ny threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon . . . [if] the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another." K.S.A. 2019 Supp. 21-5221(a)(2).

The district court was simply wrong in ignoring the differences between force and deadly force in reaching its legal conclusion. Compare *State v. Sanders*, No. 103,171, 2011 WL 3276191, at *5 (Kan. App. 2011) (unpublished opinion) (jury instruction appropriate on "use of force" in self-defense when defendant pointed gun but did not fire), with *Hardy*, 305 Kan. 1001 (self-defense immunity for "use of deadly force" when defendant fired gun). See 2 LaFave, Substantive Criminal Law § 10.4(a) (3d ed. 2018) ("But merely to threaten death or serious bodily harm, without any intention to carry out

16

the threat, is not to use deadly force, so that one may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger.").

The record also shows the detective's opinion testimony took different forms—one particular to Thomas and another from a general, objective law enforcement perspective. As to the former, Paden testified: "I don't know that drawing *his* weapon was a wrong act. The information that *he* had had before with the fact that Saldana was a violent man, always carried a weapon, you have to take that into consideration." (Emphases added.) And for the latter, the detective said: "I couldn't say one way or another for sure what *one officer* might find life threatening and another one might not." (Emphasis added.) The panel correctly noted failing to make this distinction blurred the legal standard the district court tried to employ. *Thomas*, 2017 WL 6064660, at *12 ("We know of no legal authority that equates a law enforcement officer's view under these circumstances with a reasonable person's objective view."). And the district court referenced no other testimony or facts supporting its conclusion that Thomas' use of deadly force was objectively reasonable.

Similarly, the district court leaped to an erroneous conclusion that Thomas must have had a reasonable subjective belief that his use of deadly force was necessary to prevent imminent death or greatly bodily harm simply because he put on a protective vest before Saldana arrived. Donning the vest preceded the conduct Thomas said justified his use of deadly force. But what he said during his police interviews about his decision to use deadly force was (1) Saldana "kept coming at him"; (2) he did not know if Saldana would go inside the house or do anything to anyone else; and (3) he never saw Saldana with a weapon. So even from Thomas' own statements, getting the vest from his truck does not show the shooting was necessary to prevent imminent death or greatly bodily harm. And without more, putting on the protective vest could just as easily support the State's view that Thomas was the initial aggressor and intended to inflict harm because he

17

chose to put on the vest and engage with Saldana while wearing it instead of simply driving away.

Finally, we note Thomas does not directly challenge the panel's additional direction that a new evidentiary hearing is necessary before making the required findings of fact and conclusions of law. *Thomas*, 2017 WL 6064660, at *13 (taking judicial notice that presiding district court judge retired while appeal was pending). We would observe that under the circumstances outlined in the panel's decision, its ruling is appropriate. As the panel directed,

> "At this evidentiary hearing the district court must consider the totality of the circumstances, weighing the evidence before it without deference to the State, and determine whether the State has met its burden to establish probable cause to believe that Thomas initially provoked the use of force against [himself], as described in K.S.A. 2016 Supp. 21-5226[b] and [c], which would render both the justification and immunity defenses unavailable to Thomas. If the district court finds that Thomas did not initially provoke the use of force, the court must consider the totality of the circumstances, weighing the evidence before it without deference to the State, and determine whether the State has met its burden to establish probable cause to believe that Thomas' use of deadly force was not statutorily justified because Thomas did not have a sincere and honest belief that it was necessary to use deadly force and/or that a reasonable person in Thomas' situation would not have perceived the use of deadly force was necessary as required by K.S.A. 2016 Supp. 21-5222." 2017 WL 6064660, at *13.

Judgment of the Court of Appeals reversing the district court's judgment and remanding is affirmed. Judgment of the district court is reversed and remanded with directions.

NUSS, C.J., not participating.

JARED B. JOHNSON, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Johnson was appointed to hear case No. 116,111 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.