No. 121,790

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

LEON A. DUKES JR.,
*Appellee*.

SYLLABUS BY THE COURT

1.

K.S.A. 2020 Supp. 21-5231(a) states that a person who is justified in the use of deadly force under K.S.A. 2020 Supp. 21-5222(b) and whose conduct meets other statutory requirements is immune from criminal prosecution and civil action for that act.

2.

After a defendant in a criminal case files a motion requesting immunity under K.S.A. 2020 Supp. 21-5231, the State must come forward with evidence establishing probable cause that the defendant's use of force was not statutorily justified. This generally means the State must show probable cause that (1) the defendant did not honestly believe the use of force was necessary or (2) a reasonable person would not believe the use of force was necessary under the circumstances.

3.

Appellate courts review the factual findings underlying a district court's ruling on use-of-force immunity for substantial competent evidence, deferring to those findings if they are supported by legal and relevant evidence in the record. Appellate courts do not reweigh conflicting evidence or second-guess district courts' credibility assessments.

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed February 12, 2021. Affirmed.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee.

Before WARNER, P.J., POWELL, J., and MCANANY, S.J.

WARNER, J.:  Kansas law immunizes a person from criminal prosecution when he or she uses deadly force while reasonably believing the force is necessary to protect that person or others from imminent death or great bodily harm. In recent years, Kansas appellate courts have considered the contours of use-of-force immunity on multiple occasions, often instructing district courts on various aspects of the interpretation or application of the statutes that define it. This case presents a set of circumstances where the district court appropriately considered and applied the law, concluding Leon A. Dukes Jr. was immune from prosecution. We affirm the court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

Leon "Tony" Dukes Jr. owned a barbershop in Wichita. Because Dukes' customers often paid for his services with cash, Dukes carried a concealed handgun for protection.

On June 19, 2018, Dukes finished at the barbershop and met up with a friend, Tanisha Bryant. Bryant and Dukes ran an errand and then returned to let the cleaner into the shop. As the two waited in Dukes' truck, a car quickly pulled into the parking lot and abruptly stopped near the truck. Neither Dukes nor Bryant recognized the car or its occupants at first. But they could see that a man in the driver seat was yelling at a woman in the passenger seat. As they watched, the man appeared to punch the woman in the

2

face. Dukes asked Bryant to stay calm, as he did not want to get involved; such confrontations were unfortunately common in the neighborhood.

The enraged driver (later identified as Lafian Berryman) got out of his car and started toward Dukes' truck. As he approached, Berryman shouted at the car's passenger (later identified as Leatha Lawton), "Where's the nigga at?" Dukes looked around, trying to find who Berryman might be referring to, but he and Bryant were the only other people in the parking lot. Lawton then got out of the car, and Dukes recognized her.

Dukes and Lawton had been involved in a relationship about a year before. More recently, Lawton had borrowed a small amount of money from Dukes so her son could put gas in his car, and she had paid him back about a week before the incident in the parking lot. A few days after she dropped the money off, Lawton messaged Dukes on Facebook, asking if he was still "loving around." Dukes had responded that he had "just been chilling." The night before the encounter in the parking lot, Dukes had received a series of messages from Lawton's Facebook account, stating:

"Nigga what you want with my bitch";

"A nigga you keep hitting the bitch up like im playing nigga I know where you work cuz";

"I will be at your shop today nigga";

"Both of y'all going to get fucc Ed up nigga";

"I ain't got nothing but time nigga";

"Think I'm playing"; and

"I will bust your ass behind this pussy bitch."

Dukes did not take these threats seriously when he received them.

As Lawton followed Berryman toward Dukes' truck, she shouted, "Tony, please tell him you and me ain't messed around." Dukes then addressed Berryman out of the cracked truck window, saying, "I ain't got nothing to do with that" and "I don't want no problems." Berryman continued towards the truck, and Bryant (who was terrified) told Dukes she thought Berryman had a gun. She then got out of the truck and ran away. Bryant later testified, "I remember the guy—the male outside the vehicle, he, like, pointed towards Tony's vehicle. And I'm not sure, I thought he had something in his hand at the time. And I remember hearing a gun cock."

Dukes drew his own handgun from between his seat and the console and pointed it at Berryman as he came up beside the truck in an effort to deter his assault, telling Berryman he did not "want any problems." When Berryman saw Dukes' gun, he said, "You want to play like that? Okay. I got something for you. I got something for you." Berryman ran to the passenger door of his car, which was closest to Dukes' truck. Dukes testified that he believed Berryman was going back to his car to get a gun: "Basically he was telling me he was going to get his gun . . . . I was thinking he was going to shoot me. He was telling me he was going to shoot me. . . . There wasn't a doubt in my mind."

When Berryman reached the open passenger door, Dukes fired his weapon several times. Dukes later explained, "I fired the gun to save my life." He continued, "I'm just explaining the way I felt, and I was scared for my life." One of the shots hit Berryman in the left arm or shoulder and then lodged in his ribcage. Berryman died from the injury.

Surveillance footage did not show whether Berryman was armed when Dukes started shooting. But a loaded semi-automatic handgun with a scratched-off serial number was later found under Berryman's body on the passenger seat of the car.

After firing his weapon, Dukes backed out of the parking lot—still holding his gun out the window—and drove away towards his grandmother's house. Dukes testified that

he saw Berryman holding a gun as Dukes drove away. Dukes then called 911. Later, Dukes went back to the parking lot to speak to the police, telling them that he fired only after Berryman "[came] out with the gun" and pointed it at him.

The State charged Dukes with voluntary manslaughter, alleging he acted with an honest but unreasonable belief that deadly force was justified. Dukes moved to dismiss the charge, asserting his actions were immune from prosecution. He claimed that he "fired his gun . . . in reasonable anticipation that [Berryman] intended to shoot him."

The district court held an evidentiary hearing on the immunity question. The court later issued a decision explaining its findings of fact and conclusions of law. In its factual findings, the court noted that the evidence was "unpersuasive" as to whether Berryman was carrying a weapon when he first approached Dukes' truck; the surveillance footage did not conclusively demonstrate this point, and two 911-callers who observed the incident provided conflicting accounts. But the court found the evidence was "clear" that "a semi-automatic weapon was found in the passenger seat of [Berryman's] vehicle." And the court found it compelling that Dukes "stressed during his testimony that [Berryman] clearly said, 'I've got something for you,' as he was running back towards his car where the gun was later found on the seat." Thus, the court found it "clear" that Dukes "had a subject[ive] belief that [Berryman] posed a danger to both [Dukes] and his passenger."

The court's decision then assessed the reasonableness of this belief. The court indicated that the State had to show probable cause "only that deploying deadly force *may* not have been justified." The court found the State met this burden, and thus Dukes was not immune from prosecution (though he was free to argue self-defense at trial).

Dukes filed a motion to reconsider, arguing the court applied the wrong standard in its ruling. Dukes argued that the State was required to establish by probable cause that a reasonable person *would not* have believed that deadly force was necessary under the

5

circumstances, not that a reasonable person *may not* have believed such force was necessary. After reconsidering the caselaw on this point, the court agreed and granted Dukes' motion to dismiss.

Upon reconsideration, the court found that the "correct standard" for use-of-force immunity considers whether the State demonstrated "there was probable cause to believe that deadly force by [Dukes] *was* not justified." Applying this standard to the facts, the court underscored that the semi-automatic weapon was found on the passenger seat in Berryman's car. The court noted that the weapon was "found by [Berryman's] hand lying across the passenger seat as if he had dropped the gun once he was shot." And it observed that this was "clearly not the location of the gun" when Berryman and Lawton arrived at the parking lot because Lawton was in the passenger seat at the time.

Based on these observations and its previous factual findings, the district court concluded that "both [Dukes'] subjective belief and the objective reasonable person standard establish that [his] use of deadly force meets the requirement under K.S.A. 2016 Supp. 21-5231." The court therefore dismissed the case. The State appeals.

DISCUSSION

Kansas' use-of-force immunity is defined by statute. See K.S.A. 2020 Supp. 21-5220 through K.S.A. 2020 Supp. 21-5231. K.S.A. 2020 Supp. 21-5222(b) states that a person is "justified in the use of deadly force" when he or she "reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm" to that person or to someone else. Courts have indicated that this statute includes both subjective and objective components. From a subjective standpoint, a defendant's use of force is justified only if he or she "sincerely believed it was necessary to kill to prevent imminent death or great bodily harm to the defendant or a third person." *State v. Thomas*, 311 Kan. 403, 410, 462 P.3d 149 (2020). And objectively, the statutory justification only

6

applies when "a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary to prevent imminent death or great bodily harm." 311 Kan. at 410-11.

A person who is justified in the use of deadly force under K.S.A. 2020 Supp. 21-5222(b) (and whose conduct meets other statutory requirements) is "immune from criminal prosecution and civil action" for that act. K.S.A. 2020 Supp. 21-5231(a). This statutory framework thus provides an actor "true immunity" from suit. *State v. Collins*, 311 Kan. 418, 424, 461 P.3d 828 (2020). In other words, "K.S.A. 2019 Supp. 21-5231 provides not only a defense to criminal liability, but also complete immunity from criminal prosecution" and civil actions. *State v. Phillips*, 312 Kan. ___, 2021 WL 137563, at *9 (No. 121,075, filed January 15, 2021); see K.S.A. 2020 Supp. 21-5231(a). For this reason, the question of immunity should be addressed "at the early stages of the proceeding based on the evidentiary record submitted" by the parties at that time. 2021 WL 137563, at *9. And the district court must act as the gatekeeper to "insulate . . . qualifying cases from continued prosecution and trial." 2021 WL 137563, at *7.

In a series of recent opinions, the Kansas Supreme Court has outlined the process for determining whether immunity applies. See *Phillips*, 2021 WL 137563; *Collins*, 311 Kan. 418; *Thomas*, 311 Kan. 403; *State v. Hardy*, 305 Kan. 1001, 390 P.3d 30 (2017). After a defendant in a criminal case files a motion requesting immunity under K.S.A. 2020 Supp. 21-5231, the State must "come forward with evidence" to show probable cause "that the defendant's use of force was not statutorily justified." *Phillips*, 2021 WL 137563, at *7. In doing so, the State must convince the district court that the evidence is "sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [the] defendant's guilt despite the claim of justified use-of-force immunity." 2021 WL 137563, Syl. ¶ 3. Practically speaking, this means that the State must show probable cause that "(1) the defendant did not honestly believe the use of force was necessary" or "(2) a reasonable person would not believe the use of force was

7

necessary under the circumstances." 2021 WL 137563, Syl. ¶ 4. The State may also overcome a defendant's request for immunity by demonstrating that the defendant was the initial aggressor as defined in K.S.A. 2020 Supp. 21-5226 and thus provoked the use of force. See 2021 WL 137563, Syl. ¶ 5.

The district court—the gatekeeper who determines whether the case may proceed beyond the request for immunity—must "consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the [person's] use of force was not statutorily justified." *Hardy*, 305 Kan. at 1011. As with any probable-cause analysis, this process involves two steps. First, the district court must make findings of fact based on the evidence presented at the hearing and the parties' stipulations. *Collins*, 311 Kan. at 425; *Thomas*, 311 Kan. at 413. Second, the district court must draw a legal conclusion, based on the totality of the circumstances, as to whether the State has met its burden to show the case should go forward. *Collins*, 311 Kan. at 425; *Thomas*, 311 Kan. at 413. Though the district court need not make particularized findings on the record regarding its analysis, the record must nevertheless demonstrate that the court "not only recognized but also applied the appropriate legal standard." *Phillips*, 2021 WL 137563, Syl. ¶ 6.

Appellate courts review the factual findings underlying a district court's ruling on use-of-force immunity for substantial competent evidence, deferring to those findings if they are supported by legal and relevant evidence in the record. See 2021 WL 137563, at *8; *State v. Macomber*, 309 Kan. 907, 916, 441 P.3d 479, *cert. denied* 140 S. Ct. 319 (2019). We do not reweigh conflicting evidence or second-guess a district court's credibility assessments. *Hardy*, 305 Kan. 1001, Syl. ¶ 5. And we review the district court's ultimate legal conclusion—whether immunity applies—de novo. *Phillips*, 2021 WL 137563, at *8.

8

The State argues that the district court deviated from its prescribed gatekeeper role in two respects. The State claims that the district court applied the wrong legal standard when it ultimately granted Dukes' request for immunity and effectively required a greater showing by the State than what probable cause demands. The State also claims that one of the district court's factual findings was not supported by evidence in the record and that this finding essentially undermined the district court's perception of the other evidence. For the reasons we discuss here, we are not persuaded by either argument.

The State first asserts that the district court applied the wrong legal standard in its final immunity ruling. The State does not dispute the district court's finding that Dukes personally believed his use of deadly force was necessary under the circumstances. But it challenges the standard the district court applied to determine whether Dukes' beliefs were objectively reasonable. Specifically, the State argues it was only required to show probable cause that a reasonable person would believe that Dukes' use of deadly force *may not have been* justified (as the district court initially found)—not, as the court later ruled, that Dukes' conduct *was not* justified. And alternatively, the State argues that the difference in the two phrases—"may not have been justified" versus "was not justified"— is semantic at best and thus should not have resulted in a different result during the court's reconsideration of the facts.

These arguments are wide of the mark. As a starting point, the standard the district court applied during its reconsideration of Dukes' request for immunity—whether the State showed a reasonable person would believe Dukes' use of deadly force "was not justified"—is the standard set forth in Kansas Supreme Court caselaw. See *Phillips*, 2021 WL 137563, Syl. ¶ 1; *Collins*, 311 Kan. 418, Syl. ¶ 1; *Thomas*, 311 Kan. 403, Syl. ¶ 1; *Hardy*, 305 Kan. 1001, Syl. ¶ 1 (all indicating the State must prove the use of force "was not statutorily justified"). The State acknowledges as much in its brief. Thus, the district court set forth the correct legal standard when it reconsidered its immunity decision.

As the district court explained in its reconsideration decision, the standard it applied initially—whether the use of force "may not have been justified"—was based on a phrase from this court's decision in *State v. Collins*, 56 Kan. App. 2d 140, 425 P.3d 630 (2018), that was taken out of context. The State argues that this phrase means the same thing as "was not justified" because the State was merely required to show probable cause to believe Dukes' use of deadly force did not meet the definition in K.S.A. 2020 Supp. 21-5222(b). But we disagree. As the district court here acknowledged, the first standard it applied—whether the use of force "may not have been justified"—caused the court to analyze the evidence differently than it did under the standard articulated by the Kansas Supreme Court. Accord *Phillips*, 2021 WL 137563, at *8 (emphasizing that the district court must recognize and apply the correct legal standard).

The State's attempt to equate these two phrases is belied by its alternative argument—that the standard the district court ultimately applied (requiring a showing that the use of deadly force "was not justified") elevated the State's burden of proof beyond probable cause. This argument, too, is without merit. Indeed, the Kansas Supreme Court effectively rejected it in *Hardy*, 305 Kan. at 1011-12, when the court articulated the appropriate standard in use-of-force immunity, and we are bound by that precedent. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). But the State's argument is also unpersuasive because the State's burden when faced with a request for immunity, as explained by Kansas Supreme Court caselaw, is consistent with other pretrial probable-cause assessments.

During a preliminary hearing in a criminal case, the State is not required to prove the elements of the crime charged beyond a reasonable doubt. Instead, the State must convince the court that the evidence is "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *State v. Huser*, 265 Kan. 228, 230, 959 P.2d 908 (1998). Likewise, when a defendant requests immunity under K.S.A. 2020 Supp. 21-5231, the State is not required to provide a level

10

of proof necessary to sustain a criminal conviction. Rather, the State must show that a person of ordinary prudence and caution would not believe the use of force was necessary to protect the defendant or another person from a qualifying injury. See, e.g., *Macomber*, 309 Kan. at 917-18 (affirming the district court's ruling that there was "probable cause that Macomber's use of deadly force was not statutorily justified"). The district court applied this standard here.

Finally, the State argues that even if the district court applied the correct legal standard, its ruling relied on a factual finding that was not supported by the evidence at the hearing. The State points out that though Dukes initially told the police that Berryman had a gun when he first approached Dukes' truck, Dukes acknowledged at the hearing that he probably did not. Both decisions by the district court described Dukes' changing account as "waffl[ing]" on whether Berryman initially had a gun. The State argues that this description was contrary to the record and infected the court's remaining findings, some of which relied on Dukes' description of his fear and motivation for shooting when he did. The State argues that the court should have inferred from Dukes' changing accounts that Dukes was the "initial aggressor" and thus not entitled to immunity.

The district court found the evidence conflicted as to whether Berryman had a gun when he first approached Dukes' truck, noting that two witnesses had reported Berryman was carrying a gun at that point and one other witness did not. The court also noted that Dukes' description when he originally reported the incident to the police was different from his testimony at the hearing. But the court found it was unnecessary to resolve this conflict because Dukes' actions were justified in light of Berryman's subsequent conduct.

In particular, the court found that Berryman had a semi-automatic weapon within reach (under him on the passenger seat) when he returned to his car. The district court found that this evidence and a reasonable inference therefrom—Berryman had purposefully retrieved the gun since Lawton was in the passenger seat when Berryman

11

drove into the parking lot—combined with Dukes' testimony that he believed Berryman was retrieving a gun with the intent to shoot him and that Dukes saw Berryman with a gun when Dukes drove away, were sufficient to convince a reasonable person that Dukes acted with a reasonable belief that his life was in danger.

Having reviewed the transcript of the evidentiary hearing, we conclude there is evidence in the record that supports the district court's finding that Dukes "waffled"—i.e., vacillated or flip-flopped—in his account of whether Berryman had a gun when he first approached Dukes' truck. See Merriam-Webster.com, https://www.merriam-webster.com/dictionary/waffle (online ed. 2021). As the district court indicated, Dukes initially told the police that Berryman carried a gun when he came toward the truck, but at the hearing Dukes stated he thought he saw Berryman with a gun when Dukes was driving out of the parking lot. The State places too fine a point on the district court's use of the verb "waffled" (instead of using a word like "altered"), especially since the State did not correct the court when it used the same language in its initial denial of Dukes' request for immunity. Regardless, the district court's finding is supported by substantial competent evidence in the record.

At its core, the State's argument is not so much a challenge to the sufficiency of the evidence supporting the district court's finding as it is an effort to undermine to the court's credibility assessments and weighing of Dukes' testimony against the State's assertions that Dukes, not Berryman, was the initial aggressor in the confrontation. In its brief, the State urges several reasons why the court should not have credited Dukes' account of the events. But it is not our role on appeal to second-guess credibility determinations. Instead, we must determine whether relevant and legal evidence in the record supports the district court's factual findings. See *Macomber*, 309 Kan. at 916.

The State presented its initial-aggressor theory to the district court, and the court did not find that theory persuasive. The court noted in its factual findings that regardless

of whether Berryman was carrying a gun when he approached the truck, he was aggressive and confrontational. At least two witnesses other than Dukes believed that Berryman was armed from the outset. The evidence showed that Dukes had received several threatening messages—sent from Lawton's phone, but apparently by Berryman—the previous day. And though Dukes did point his gun at Berryman in an effort to deter his aggressive approach, K.S.A. 2020 Supp. 21-5221(a)(2) indicates that the threat of deadly force, including "the display or production of a weapon," does not "constitute use of deadly force" if that act is done for the limited purpose of "creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another." The district court did not abuse its discretion when it rejected the State's argument that Dukes was the initial aggressor. Accord *State v. Smith*, 303 Kan. 673, 679, 366 P.3d 226 (2016) (affirming the district court's rejection of the State's argument in an *Ortiz* hearing when the State failed to carry its evidentiary burden of proof).

Under K.S.A. 2020 Supp. 21-5222(b), Dukes could use deadly force if he reasonably believed it was necessary to prevent imminent death or great bodily harm to himself or others. Dukes was faced with a situation where an aggressive man charged his vehicle and threatened him. But Dukes only used deadly force—that is, he only shot at Berryman—when Berryman yelled, "I've got something for you" and darted to retrieve his own gun. Berryman was found with a loaded semi-automatic weapon close to his hand.

The State bore the burden to establish probable cause to believe that Dukes' use of deadly force was not legally justified. The district court did not err when it found the State failed to make this showing and granted Dukes' request for immunity under K.S.A. 2020 Supp. 21-5231(a).

Affirmed.