No. 117,743

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

SETH COLLINS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The "stand your ground" law in Kansas encompasses a number of provisions providing for the use of force, including deadly force, in defense of a person or property. K.S.A. 2017 Supp. 21-5220 et seq. The linchpin of this law is its provision for self-defense immunity.

2.

Kansas courts have developed a two-prong test—subjective and objective—to determine whether a person's use of deadly force was lawful. The subjective prong of the test requires a showing that the person sincerely and honestly believed it was necessary to kill or cause great bodily harm to defend himself or herself. The objective prong requires a showing that a reasonable person in such person's circumstances would have perceived the use of deadly force in self-defense as necessary.

3.

K.S.A. 2017 Supp. 21-5231 provides immunity to a person using lawful force in defense of a person or property. Immunity represents a far greater right than any

encompassed by an affirmative defense, which may be asserted during trial but cannot stop a trial altogether. Immunity prevents a case from going to trial.

4.

When considering a defendant's motion for immunity under K.S.A. 2017 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified.

5.

To overcome a defendant's self-defense immunity claim, the State merely has to establish probable cause that the defendant's use of force was not justified. Probable cause has been defined as evidence sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt despite his claim of justified use-of-force immunity. Stated another way, the State must present evidence showing that an ordinarily prudent and cautious person could believe that (1) a reasonable person would not have believed deadly force was necessary under the circumstances or (2) the defendant did not honestly believe deadly force was necessary to protect himself or herself from death or great bodily harm.

Appeal from Sedgwick District Court, JOHN J. KISNER JR., judge. Opinion filed July 20, 2018. Reversed and remanded with directions.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee.

Before POWELL, P.J., ATCHESON and BRUNS, JJ.

POWELL, J.:  Seth Collins was involved in a tragic and unfortunate fracas with three unarmed women at the top of the stairs in his apartment building, resulting in the death of one and serious injury to another. Collins was charged with second-degree murder and aggravated battery, but he claimed self-defense immunity pursuant to K.S.A. 2017 Supp. 21-5231. After an evidentiary hearing, the district court granted Collins' motion for immunity and dismissed the case. The State now appeals the district court's grant of self-defense immunity, claiming the district court erred because (1) Collins lacked the reasonable belief that he needed to use deadly force to prevent great bodily harm against himself and (2) Collins was precluded from self-defense immunity because he was an aggressor under K.S.A. 2017 Supp. 21-5226(c) and was not subject to either safe harbor retreat exception. We agree with the State that a grant of self-defense immunity was unwarranted and reverse and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2016, the State charged Collins with one count of intentional second degree murder in violation of K.S.A. 2015 Supp. 21-5403(a)(1) and one count of reckless aggravated battery in violation of K.S.A. 2015 Supp. 21-5413(b)(2)(B). The charges arose from two incidents on April 30, 2016, between Collins and his neighbor's identical twin daughters that ended in a fatal stab wound to Kayla Brown's neck and another to her shoulder, a stab wound to Shayla Brown's bicep, and multiple injuries to Collins' head and body. Prior to trial, in July 2016, Collins filed a motion to dismiss and requested an evidentiary hearing on his claim of self-defense immunity from prosecution. In response, the district court held a three-day evidentiary hearing where multiple witnesses testified to the events that occurred on that tragic day in April.

3

On April 30, 2016, Collins was returning home to his apartment around 9 p.m. after getting ice cream with his two daughters. As he drove to the front of his building, he saw an open parking space and attempted to park his car. However, Collins realized he could not park his car safely in the space because the car next to the space had the driver's-side door open and Shayla was standing inside of the open car door talking to her friend, Luz Toral. It was disputed whether Collins politely asked Shayla to move so that he could park his car in that space. What was undisputed was that Collins and Shayla got into a verbal argument that included an exchange of racial and other insults. Eventually, Collins parked elsewhere in the guest parking lot.

For context, Collins is a 38-year-old, white male who is 5' 11" and weighs about 250 to 255 lbs. Shayla is a 22-year-old black female who is 4' 11" and weighs about 113 lbs.; her identical twin Kayla was the same height as Shayla but weighed nearly 10 pounds less. Toral is a white female, who is about 5' 3" and weighs about 180 lbs.

After parking his car, Collins walked towards Shayla and Toral while his two daughters walked behind him. Another argument started between Collins and Toral that led to the two pushing each other back and forth. As this was occurring, Collins' 15-year-old daughter took his 8-year-old daughter's hand and went to the closest apartment building. Shayla and Kayla became involved, and eventually a physical fight broke out between Collins, the three girls, and a few others. Trishall Dear, the twins' mother, heard the commotion from inside her apartment and ran down to see what was happening. Dear attempted to break up the fight, but she was hit by Collins, prompting her to hit him back. Ultimately, Dear was able to break up the fight. This first altercation lasted about five to ten minutes.

Dear told Collins to go to his apartment, and he complied. Collins lived in a second floor apartment beneath Dear. Dear then told Toral to leave, and Toral testified that she did so. Shayla, Kayla, and their friend Coriaynia Porter, who was involved in the

4

altercation, went and sat in Kayla's car. Dear planned to stay outside and let things calm down and then go upstairs to her apartment to get a cigarette.

During the altercation, Collins' older daughter called 911, and, because the girls were scared, a neighbor led them back to their apartment. Collins stated that when his daughters arrived, his older daughter was on the phone with the police. After the first altercation, Collins had injuries to his head, which caused bruising and swelling to his eyes, ears, and a bump on the right side of his face. He also had scratches on his back and injuries to other parts of his body. After five to ten minutes had passed, Collins realized he did not have his eyeglasses and went outside to look for them. Collins testified that he carries a pocket knife in his pants pocket on a daily basis and that he had the knife on him throughout the night, including during the first altercation. The pocket knife is foldable with a four-and-a-half-inch handle and four-inch blade.

Several witnesses gave conflicting testimony regarding the second altercation. When Collins walked out of the only entrance to his apartment building, Shayla and Dear were standing outside. Porter testified that Kayla was sitting in the car with her, and Shayla and Dear were outside talking near the front entrance. Collins found his glasses on the ground and walked back towards the entrance. Witnesses Brittany Carr-Bidwell and Porter stated that, at this time, Collins was muttering, and Carr-Bidwell told detectives that night that he was repeatedly saying the "N-word" and "B-word."

Another argument erupted between Collins and the twins. Three witnesses testified that when Collins walked past Dear into the building, he muttered something under his breath that escalated the situation. Eva Bidwell—who saw the first altercation while helping her son, Michael Bidwell, and daughter-in-law, Carr-Bidwell, move out of a nearby apartment—testified that when Collins muttered something to Dear, Dear responded, "I wish you would touch me," and things escalated. Collins testified he did not say anything to Dear when he walked past her and into the stairwell but claimed the

twins were yelling insults at him, and he turned and told them it all could have been prevented if they had let him park his car.

Dear testified that she did not remember Collins saying anything to her when he walked past her and that she opened the door for Collins and followed him inside to make sure things stayed calm. Dear testified that there was not a confrontation between Collins and the twins before he walked into the building but that her daughters followed her inside to protect her. Shayla testified that she got out of the car and followed her mother inside because she wanted to make sure Dear was okay. Porter stated that Kayla got out of the car after she saw Dear and Shayla go inside.

Collins then walked up the nine steps to the second floor landing. As he walked, Dear was about one to two steps behind him; and Shayla and Kayla were about one step behind Dear. Shayla testified that she did not remember Collins saying anything outside or inside the stairwell, but several witnesses testified that there was yelling and the three women followed Collins quickly into the building. Michael testified that he attempted to tell the women not to follow Collins into the building.

At the second floor landing, Collins turned towards the three women and brandished his knife in his right hand at about shoulder height with the blade out and pointing up. Collins testified that he told the women to back off but did not advance towards them or stab or swing the knife at them. Collins stated that as he walked up the stairs, the women were brushing his back, but he admitted no one had punched, pushed, or smacked him. Dear testified that she blacked out when she saw the knife. Shayla testified it was the first time she saw that Collins had a knife and that he did not say anything and started swinging the knife.

After that, Shayla testified Collins' back might have been turned and that she grabbed his shirt collar and pulled him down, causing all four people to fall backwards

6

down the stairs. Collins was swinging his knife as everyone fell, and Shayla stated that he hit her in the arm at that time. Collins testified that, at one point, his knife hit something that felt more like a stab than a cut and that he swung the knife to defend himself as he fell down the stairs. At the bottom of the stairs, Kayla hit a large window and several people saw that she was bleeding from her neck and mouth. Shayla testified she tried with both hands to get the knife out of Collins' hand when she reached the bottom landing. Eva testified she started yelling at Dear and Shayla to stop and help Kayla due to her injuries. Dear testified that when she saw the extent of Kayla's injuries, she tried to help Kayla. Shayla also released Collins and went to help her sister. Collins then stood up, folded his pocket knife, and went up to his apartment.

After the evidentiary hearing, the district court issued a written order granting Collins self-defense immunity and dismissing the charges against him. The district court held that based on the evidence, "[u]nder the circumstances, it was reasonable for Mr. Collins to believe that this use of deadly force was necessary to prevent great bodily harm to himself." The district court made factual findings regarding the above testimony leading up to and in the stairwell, including:

> "i) Mr. Collins locates his glasses, exchanged words with Kayla and/or Shayla and walked back into his apartment building. Ms. Dear and Ms. Bidwell are standing outside near the door into the building. As he is walking to the door or entering the door, Mr. Collins walked past Ms. Dear and quietly stated something derogatory to Ms. Dear. Ms. Dear responds telling Mr. Collins that she wished he would lay his hands on her and see how far he would get. Based upon the totality of the inconsistent testimony as noted in some detail above, this Court finds that there was no physical contact between Mr. Collins and either of the Brown sisters or Ms. Dear in these few minutes prior to the stabbing incident.

> "j) As Ms. Dear follows Mr. Collins into the apartment building, Shayla and Kayla Brown start towards them. They go past Ms. Bidwell and as Mr. Collins walks up the stairs, he is followed by Ms. Dear, Shayla Brown and Kayla Brown. As Mr. Collins

7

gets towards the top of the stairs, all three ladies are very close (just a step or two) behind him and he looks back at them.

"k) As Mr. Collins gets to the top of the first flight of stairs, he turns towards the three ladies immediately behind him and displays a knife. The testimony indicates that Collins initially held the knife in his right hand; with the blade open; with the blade pointing up; and he held it about shoulder to head-high next to him.

"l) While the precise details concerning these few key seconds vary significantly, the evidence indicates that within moments of Mr. Collins displaying the knife, Shayla Brown grabbed the back of his shirt collar and pulled him back towards her, her sister and her mother. In the next few moments, Mr. Collins, Shayla, Kayla, and Ms. Dear all fell back down the staircase.

"m) The staircase consisted of nine (9) stairs, including the landing, and they were carpeted with what appears to be worn high traffic carpet. . . .

"n) No evidence was presented to clearly indicate who was stabbed first or the exact location of Kayla or Shayla at the time they were stabbed. The evidence is clear that Shayla Brown was stabbed on her left bicep and Kayla Brown sustained a fatal stab wound on the left side of her neck.

"o) Once at the bottom of the stairs Shayla held Mr. Collins down momentarily and Mr. Collins still had the knife. Once Ms. Dear saw how seriously wounded Kayla was injured, she went to aid Kayla. Shayla then released her hold on Mr. Collins to assist her mother and sister.

"p) Mr. Collins gets up, folds up his pocket knife and goes back up the stairs to his apartment."

The State timely appeals from the district court's grant of immunity and dismissal of the charges against Collins.

8

DID THE DISTRICT COURT ERR IN GRANTING SELF-DEFENSE IMMUNITY?

The State argues the district court erred in granting Collins immunity under K.S.A. 2017 Supp. 21-5231 and dismissing the charges against him.

A.    *Stand Your Ground Law*

Before we examine the merits of the State's appeal, we think some background concerning the statutory framework behind Collins' claim of self-defense immunity is helpful. In 2010, our Legislature passed what is commonly known as the "stand your ground" law, which encompasses a number of provisions providing for the use of force, including deadly force, in defense of a person or property. K.S.A. 2017 Supp. 21-5220 et seq.

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

> "(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person." K.S.A. 2017 Supp. 21-5222.

K.S.A. 2017 Supp. 21-5221 defines the use of force and deadly force and provides when each applies:

"(a) As used in . . . K.S.A. 2017 Supp. 21-5202 through 21-5208, 21-5210 through 21-5212, and 21-5220 through 21-5231, . . . and amendments thereto:

(1) 'Use of force' means any or all of the following directed at or upon another person or thing: (A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another.

(2) 'Use of deadly force' means the application of any physical force described in paragraph (1) which is likely to cause death or great bodily harm to a person. Any threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon, shall not constitute use of deadly force, so long as the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another or to affect a lawful arrest.

"(b) An actor who threatens deadly force as described in subsection (a)(1) shall be subject to the determination in subsection (a) of . . . K.S.A. 2017 Supp. 21-5222, and amendments thereto, and not to the determination in subsection (b) of . . . K.S.A. 2017 Supp. 21-5222, and amendments thereto."

Of particular note, K.S.A. 2017 Supp. 21-5221(a)(2) specifically excludes from the definition of the use of deadly force any *threat* to use deadly force and defines that conduct as merely the use of force.

Kansas courts have developed a two-pronged test—subjective and objective—to determine whether a defendant's use of deadly force was lawful. The subjective prong of the test "requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill [or cause great bodily harm] to defend [himself]. The [objective] prong . . . requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary." *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012). The critical consideration

10

regarding the objective prong is "the reasonableness of [the defendant's] belief that self-defense was necessary." *State v. Walters*, 284 Kan. 1, 16, 159 P.3d 174 (2007). See K.S.A. 2017 Supp. 21-5222 (justifiable use of force in defense of a person); K.S.A. 2017 Supp. 21-5223 (justifiable use of force in defense of a dwelling, place of work, or occupied vehicle); K.S.A. 2017 Supp. 21-5225 (justifiable use of force in defense of property other than a dwelling, place of work, or occupied vehicle); K.S.A. 2017 Supp. 21-5230 (no duty to retreat).

Although not implicated in this case, a person's use of deadly force is presumptively lawful when the person against whom deadly force is being used

"(A) is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force; or

"(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force." K.S.A. 2017 Supp. 21-5224(a)(1).

Such a presumption also applies when the person using force knows or has reason to know that any of the conditions in (A) or (B) is occurring or has occurred. K.S.A. 2017 Supp. 21-5224(a)(2).

These presumptions do not apply if, at the time force is used,

"(1) the person against whom the force is used has a right to be in, or is a lawful resident of, the dwelling, place of work or occupied vehicle of the person using force, and is not subject to [a protective order barring] such person's presence in the property;

11

"(2) the person sought to be removed is a child, grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the force is used;

"(3) the person using force is engaged in the commission of a crime, attempting to escape from a location where a crime has been committed, or is using the dwelling, place of work or occupied vehicle to further the commission of a crime; or

"(4) the person against whom the force is used is a law enforcement officer who has entered or is attempting to enter a dwelling, place of work or occupied vehicle in the lawful performance of such officer's lawful duties, and the person using force knows or reasonably should know that the person who has entered or is attempting to enter is a law enforcement officer." K.S.A. 2017 Supp. 21-5224(b).

A claim of self-defense cannot be used by a person who

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2017 Supp. 21-5226(c).

The linchpin of the "stand your ground" law provides immunity from prosecution to any person who lawfully uses force in defense of a person or property.

"(a) A person who uses force which, subject to the provisions of K.S.A. 2017 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2017 Supp. 21-

12

5222, 21-5223, or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause." K.S.A. 2017 Supp. 21-5231.

This particular provision is significant because it does more than provide an affirmative defense of self-defense. It provides immunity to a person using lawful force in defense of a person or property which "'represents a far greater right than any encompassed by an affirmative defense, which may be asserted during trial but cannot stop a trial altogether.'" *State v. Hardy*, 305 Kan. 1001, 1010, 390 P.3d 30 (2017) (quoting *State v. Evans*, 51 Kan. App. 2d at 1062-64, 360 P.3d 1086 [2015], [Arnold-Burger, J., dissenting]). "A true immunity . . . [also] carries with it the necessity of a procedural gatekeeping function, typically exercised by a detached magistrate, who will prevent certain cases from ever getting to a trial and a jury." 305 Kan. at 1010. As a result, our Supreme Court requires that when a defendant, like Collins in the present case, files a motion for immunity pursuant to K.S.A. 2017 Supp. 21-5231,

"the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." 305 Kan. 1001, Syl. ¶ 1.

13

This probable cause determination made by the district court when considering the totality of the circumstances must be based upon evidence presented at the hearing, stipulated to by the parties, or both. 305 Kan. at 1012.

However, to overcome a defendant's immunity claim, the State does not need to *prove* that the defendant's use of force was not justified; it merely has to establish probable cause that the defendant's use of force was not justified. Probable cause has been defined as "evidence sufficient for a person of 'ordinary prudence and caution to conscientiously entertain a reasonable belief' of [the defendant's] guilt despite his claim of justified use-of-force immunity." *State v. Ultreras*, 296 Kan. 828, 846, 295 P.3d 1020 (2013). It requires sufficient evidence to persuade a reasonably cautious person of the proposition. See *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 21, 290 P.3d 555 (2012). In other words, the evidence must support a reasonable belief of the proposition, which is more evidence than required to support a reasonable suspicion but less than a preponderance of the evidence, meaning the proposition is more likely true than not. See *State v. Bell*, 268 Kan. 764, 767, 1 P.3d 325 (2000); *State v. Lloyd*, 52 Kan. App. 2d 780, Syl. ¶ 4, 375 P.3d 1013 (2016). Our Supreme Court has stated that evidence which "tends to disclose" the required proposition supports probable cause to believe that proposition. *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012). Therefore, in the case of a self-defense immunity claim, the State must present evidence persuading a reasonable person that deploying deadly force may not have been justified—a probability less than more likely than not.

Stated another way, to overcome a defendant's immunity claim, the State must present evidence showing that an ordinarily prudent and cautious person could believe that (1) a reasonable person would not have believed deadly force was necessary under the circumstances or (2) the defendant did not honestly believe deadly force was necessary to protect himself from death or great bodily harm. See *State v. Wiseman*, No. 113,468, 2018 WL 911420, at *5 (Kan. App. 2018) (unpublished opinion). Alternatively,

14

the State can also succeed in meeting its probable cause burden if it presents evidence the defendant acted as an aggressor and provoked the use of force under K.S.A. 2017 Supp. 21-5226(c).

B.     *Standard of Review*

When reviewing a district court's decision on a motion for immunity,

> "[a]n appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo. When there are no disputed material facts, a pure question of law is presented over which an appellate court exercises unlimited review." *Hardy*, 305 Kan. 1001, Syl. ¶ 5.

"Substantial evidence is evidence that a reasonable person could accept as being adequate to support a conclusion." *State v. Ibarra*, 307 Kan. 431, 433, 411 P.3d 318 (2018).

C.     *The district court erred by finding Collins immune from prosecution.*

The State argues the district court erred in concluding (1) that a reasonable person would find the use of deadly force was necessary to prevent great bodily harm and (2) that Collins could not claim self-defense because he was an aggressor during the incident in the stairwell.

It is worth noting the district court faced a difficult decision in this case. In finding Collins immune from prosecution, the district court held that he did not have a reasonable belief to fear death because there was no evidence the three women had threatened to kill

15

him and the women did not have any type of weapon on their persons or within their reach that would have led him to reasonably believe his death was imminent. However, the district court did conclude that Collins had a reasonable belief that the use of deadly force—use of his pocket knife—was necessary to prevent great bodily harm to himself. In particular, the court found Collins had a reasonable fear of suffering great bodily harm, principally from falling down the stairs and secondarily from another physical altercation with the three women. The district court effectively credited Collins' testimony that he believed he was acting in self-defense by swinging the knife at least twice as he fell down the stairs.

At the outset, the principal problem we see with the district court's decision granting immunity is that it made the legal finding that Collins' use of deadly force was lawful because he reasonably believed that deadly force was necessary to prevent great bodily harm to himself. But as we have already explained above, the district court was not required to answer the question of whether Collins was justified in his use of deadly force in self-defense. The State's burden in overcoming Collins' immunity claim was simply to establish probable cause that his use of deadly force in self-defense *was not* justified. Under the facts in this case, and because it is such a close call, conceivably both could be true. Accordingly, the district court could be reversed on this ground alone. But given that the district court could be right for the wrong reasons, we will examine the issue further. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015).

Even if the district court had applied the correct legal standard to the evidence, the facts as found by the district court do not support a grant of immunity.

First, while Collins may have felt himself under attack as he climbed the stairs with the three women following him closely behind and even though he was pulled down from behind, we fail to see how a person in Collins' position could choose to defend himself from great bodily harm—great bodily harm being supposedly inflicted by falling

16

down the stairs according to the district court—by blindly stabbing at the people around him as he falls down the stairs.

Second, as a corollary to the first point, the district court's finding that Collins was at risk of great bodily harm by being pulled down the stairs is unsupported by the evidence. Our Supreme Court has often differentiated between bodily harm and great bodily harm and has defined great bodily harm "as 'more than slight, trivial, minor, or moderate harm, that does not include mere bruising, which is likely to be sustained by simple battery.'" *State v. Williams*, 295 Kan. 506, 522, 286 P.3d 195 (2012) (quoting *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241, *cert. denied* 549 U.S. 913 [2006]). While Collins was pulled down the stairs and did fall, no evidence in the record exists to show that Collins suffered great bodily harm. Once his assailants realized that one of them had been fatally stabbed, Collins simply got up, folded his knife, put it in his pocket, and walked away. There was no evidence he was injured by the fall, and the district court acknowledged there was no expert testimony presented to support the proposition that Collins' fall down the stairs would have caused him great bodily harm. Therefore, the evidence does not support the district court's finding that Collins could have reasonably feared being subjected to great bodily harm.

Third, the district court's finding that Collins reasonably feared a second attack that could have caused him great bodily harm is also not supported by the record. Admittedly, Collins may have reasonably assumed he would face similar injuries as the ones he received during the parking lot incident if a physical altercation occurred at the bottom of the stairs, but Collins did not suffer great bodily harm from the parking lot incident. The record shows Collins merely suffered from bruising, swelling, and scratches from the first altercation. Moreover, Collins' injuries from the first attack apparently were not serious enough to dissuade him from returning to the scene to retrieve his glasses or to use racial epithets at his attackers.

Additionally, the district court found that the first incident had clearly ended; thus, Collins' act of stabbing the twins in the stairwell is more attenuated from the twins' previous use of force against him during the parking lot incident. Collins described the women's actions as he climbed up the stairs as following him closely and brushing up against his back, but he stated no one punched, pushed, or smacked him. The women's close proximity to Collins was admittedly intimidating, but the evidence does not show the unarmed women verbally threatened or made any substantial physical contact against Collins before he showed the knife. Although Collins testified that he feared for his safety and swung the knife in self-defense as he fell down the stairs, that testimony, at best, satisfies the subjective component of a self-defense claim. It does not establish the objective component—that a reasonable person would have acted in that manner. Thus, Collins' use of deadly force in stabbing the twins after being pulled down the stairs from behind by Shayla likely does not meet the objective prong in the use of deadly force analysis. See *McCullough*, 293 Kan. at 975. An ordinarily prudent and cautious person could have reasonably concluded that Collins' use of deadly force against three unarmed women was not legally justified.

Fourth, given our determination that the State met its burden to overcome Collins' immunity claim, we need not directly address the question of whether Collins acted as the aggressor, thus negating his claim of self-defense immunity. However, the fact that the district court found it was possible Collins "was looking for a fight" and "was looking for a chance to pull out the knife and use it" bolsters our legal conclusion that an ordinarily prudent and cautious person could have reasonably concluded, based upon the evidence in the record and the district court's factual findings, that Collins' use of deadly force was not legally justified. In fact, a reasonable person could conclude that Collins' use of deadly force may have been excessive, and Kansas courts have reasoned that the use of excessive force can transform a lawful act of self-defense into an unlawful one. See *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 (1995) ("Although it is possible for an actor to use excessive force in self-defense, the actor cannot unintentionally act in self-

18

defense."). See also *State v. Uk*, No. 113,900, 2018 WL 793537, at *9 (Kan. App. 2018) (unpublished opinion) (Buser, J., dissenting) ("'[I]t is well settled that a person cannot use greater force than is reasonably necessary to resist the attack.'") (quoting *State v. Marks*, 226 Kan. 704, 712, 602 P.2d 1344 [1979]).

We acknowledge the controverted nature of the evidence in this case and that reasonable people could differ as to the reasonableness of Collins' use of deadly force in self-defense. But Collins is entitled to immunity for his use of deadly force in self-defense only if the State is unable to establish that an ordinarily prudent and cautious person reasonably could have concluded that Collins' use of deadly force was not justified. In our view, the State met its burden because a reasonable person—given the district court's assessment of the conflicting evidence—could have concluded Collins' acts were not justified. Collins' claim of self-defense is, therefore, appropriately left for a jury to decide as a matter of reasonable doubt bearing on his guilt of the charges.

The district court's grant of immunity and dismissal of the charges against Collins is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.