NOT DESIGNATED FOR PUBLICATION

No. 125,184

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN AUSTIN DRAKE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Submitted without oral argument. Opinion filed February 16, 2024. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Brian Deiter*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., PICKERING, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM:  Steven Austin Drake was charged with intentional, premeditated first-degree murder after he shot and killed Bryce Holladay inside of Drake's apartment, following an unsuccessful attempt to physically remove Holladay from the dwelling. A jury convicted Drake of the lesser included offense of voluntary manslaughter. Drake appeals his conviction, arguing the district court erred in denying his pretrial motion for immunity based on self-defense, defense of others, and defense of a dwelling. Drake also claims that the State presented insufficient evidence at trial from which the jury could reasonably determine that he was not entitled to a presumption of immunity. Finding no error, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 2017, Drake and his girlfriend, Logan Stone, drove from Lawrence to Baldwin City to visit Riley Boyle-Wolf. As they were leaving Lawrence, Drake and Stone saw Bryce Holladay standing on a sidewalk talking to two Lawrence police officers. Drake knew Holladay because Drake previously lived with the mother of Holladay's daughter. Drake and Stone did not stop and continued to Baldwin.

After being at Boyle-Wolf's house for about an hour, Drake and Stone were contacted by Jamie Dupuis, Drake's friend and roommate. Dupuis told them that Holladay showed up at Drake and Dupuis' apartment in Lawrence, acting strange, rummaging through everyone's belongings, and putting random items in his pockets. Eventually Boyle-Wolf, who had known Holladay since grade school, spoke to Holladay to calm him down. Boyle-Wolf told Holladay not to steal anything and to leave Drake and Dupuis' apartment. During this conversation, Boyle-Wolf assumed that Holladay was intoxicated, possibly under the influence of methamphetamine, because he was talking very rapidly and seemed jittery. Regardless, by the end of their conversation, Boyle-Wolf thought that he had convinced Holladay to leave Drake and Dupuis' apartment.

Drake and Stone stayed at Boyle-Wolf's house for another 30 minutes or so before returning to Lawrence. When they left, their plan was to stop by Drake's apartment to pick up a change of clothes before heading to Stone's house to spend the night. After arriving at Drake's, Stone and Drake realized that Holladay did not leave the apartment as Boyle-Wolf instructed. When they walked in, Holladay was sitting on the couch with Dupuis. Drake and Stone asked Holladay why he was still there and told him to leave. They also told him to leave anything that he may have taken from the apartment. Drake continued to talk to Holladay, but Stone left to buy cigarettes. Their interaction was largely uneventful, but Drake grew increasingly frustrated with Holladay's presence at the apartment and his odd behavior.

2

About the time Holladay was wanting to show a card trick, Drake sent a Facebook message to Dupuis, who was in the same room, in which Drake stated, "'I'm bout to shoot him with the 410.'" Dupuis responded, "'Do it!!! . . . He woke me up and I tried pushing him out the door.'"

Several minutes later, Drake texted Jessica Brown. Drake considered Brown to be his stepmother because his father had a longstanding relationship with her. It was Brown's apartment in which Drake lived, along with Dupuis and Drake's cousin. In the recent past, after Brown discovered Holladay rummaging through Dupuis' car, she told Holladay he was not allowed to come back to her apartment.

In the text messages, Drake told Brown that Holladay was in their apartment, and she needed to come there immediately. One of the texts that Drake sent Brown stated, "about to shoot [Holladay] in the head with my shotgun, this is not a joke. Where the fuck are you." In another he stated. "don't call me, just get here. I'm serious, I'm going to shoot him." Brown received these texts while returning from a trip to Kansas City.

When Brown arrived and pulled into the driveway, she could hear yelling from the apartment. When she entered, she saw Drake and Holladay standing near the couch, arguing. Brown told Holladay to leave, but Holladay refused. Stone returned from buying cigarettes sometime after Brown arrived. Stone noticed that the atmosphere in the apartment had become more "tense" than it was when she left.

Brown demanded that Holladay empty his pockets so she could see what he had taken. Holladay emptied his pockets and then started disrobing in the living room. Brown and Drake told Holladay they did not want to see him naked and looked away while he put his clothes back on. When Holladay was getting dressed, Drake attempted to push him out of the front door of the apartment. Brown recognized that Drake was not making much progress as Holladay was bigger and stronger than Drake, so she picked up a

3

baseball bat and threatened to hit Holladay with it. She decided not to use the bat for fear that Holladay might get it from her and use it.

Drake, Brown, Stone, and Dupuis joined forces in shoving Holladay to get him out of the apartment. Stone would later testify that as they all pushed against Holladay, he became more aggressive and violent. The four of them were still unable to get Holladay out of the door; he was able to keep at least half of his body between the door and the door jamb. Stone decided to mace Holladay, hoping that he would put his hands up to wipe his eyes and create an opportunity for everyone else to shove him out through the doorway, but the mace tactic backfired, and Holladay became enraged. Stone told the jury that in response to being maced, Holladay struck her in the face. Stone also recalled Holladay striking Brown several times with the door as he struggled to remain inside the apartment.

Like Stone, Brown also tried to mace Holladay as they all struggled in the doorway. This, however, made Holladay more aggressive again. Brown then decided to call the police, and she went to the kitchen to retrieve her phone and dialed 911. Drake warned Holladay to leave because he was going to get a pistol. When Drake returned with the gun, he pleaded with Holladay to leave, and ultimately gave him a final warning that he had five seconds to leave or be shot. Drake then shot Holladay in the head, killing him. When Brown heard the gunshot, she hung up on the emergency operator.

After shooting Holladay, Drake put the gun on a coffee table in the living room and partially disassembled it. The 911 operator called back, and Drake told her that someone had broken into his apartment and that he had shot the man in the face. When law enforcement arrived at the apartment, Drake went outside and submitted to his arrest.

The State charged Drake with one count of first-degree murder, alleging Drake killed Holladay intentionally and with premeditation. Drake filed a motion to dismiss,

4

claiming he was immune from prosecution under K.S.A. 2017 Supp. 21-5231. Drake claimed that his use of deadly force was justified under K.S.A. 2017 Supp. 21-5222 (defense of a person) and K.S.A. 2017 Supp. 21-5223 (defense of a dwelling).

*Evidentiary Hearing on Drake's Motion for Immunity*

The district court held a two-day preliminary hearing and considered the evidence presented to decide Drake's immunity motion. The State presented testimony from most of the parties already discussed—Boyle-Wolf, Brown, Dupuis, and Stone. Drake did not testify at the hearing, but his statements to police were introduced into evidence. The State also called an officer who responded to the scene, a forensic pathologist who performed Holladay's autopsy, and the detective who interviewed Drake after the shooting. Exhibits included Facebook messages between Drake and Dupuis the night of the shooting and a video of Drake's interview with police.

At the hearing, Dupuis said Holladay entered the apartment without permission while Dupuis was sleeping. But he acknowledged that in his statement to police immediately following the shooting, he said he let Holladay in the apartment. He told police that that Holladay knocked on the door and asked to see Drake. Dupuis told Holladay he could come into the apartment to wait for Drake.

Dupuis' testimony indicated that, for the most part, the argument between Drake and Holladay did not heat up or escalate too drastically. After Drake convinced Holladay to empty his pockets, Holladay pulled out some things that he took from the apartment, including an inactivated phone that belonged to Drake. Dupuis confirmed that Holladay never fully left the apartment throughout the confrontation until after he was shot and his body fell outside of the apartment door.

5

Stone testified that the conversation at the apartment was largely civil in tone, with Drake asking Holladay to leave while Holladay was muttering things that didn't make sense. Stone left to get cigarettes and when she arrived back, Brown was there, and the tone was more heated. When everyone joined in trying to push Holladay out of the apartment, Stone sprayed Holladay with mace, resulting in Holladay becoming angry and becoming more difficult to push. He also hit Stone in the eye. She testified she did not remember if Drake gave any warnings to Holladay. Drake retrieved the gun, and Stone was standing next to Drake, facing Holladay when he was shot.

The State argued that by the time Drake shoved Holladay out of the apartment and started pushing the door, Holladay was not able to cause great bodily harm or imminent death. The State admitted that the evidence showed that Holladay hit Stone but noted that she was not injured. Moreover, according to the 911 call, the State argued that Drake was unaware that Stone was ever struck and thus did not act in her defense when shooting Holladay. The State also suggested the evidence showed that rather than in self-defense or defense of others, Drake shot Holladay for other, unjustifiable reasons:

> "And what does he tell the detectives when he's being interviewed about why he shot [Holladay]? Well, some of the reasons are because he wanted to go to sleep. He had to work the next day. Because he was tired.
> "When asked why he didn't call the police, he said because it isn't something he does. And he would have just had to deal with [Holladay] again, and he didn't want to do that.
> "Detective Brown testified about the defendant's demeanor. He seemed to be proud of the fact that this had happened.
> "And you can watch him on the video. He shows no signs of remorse. He's joking. He's laughing. He's not showing anything that you would think somebody who just killed somebody would show."

On Drake's behalf, defense counsel made the following statements regarding the statutory presumption under K.S.A. 2017 Supp. 21-5224(a)(1)(A):

6

"I don't think there's any dispute that Mr. Holladay was unlawfully in the dwelling home of Ms. Brown and Mr. Drake. . . . [A]s you heard, he had been ordered to leave two weeks before by Ms. Brown and never come back.

"That night, he had been ordered to leave by everyone, including Mr. Dupuis, who had tried to get him out of the house before Mr. Drake had to be called in to help get him out of the house.

"So we get the presumption set forth in 21-5224 that a person is presumed to have a reasonable belief that deadly force is necessary. The State has not overcome that presumption with the witnesses that they have presented. In fact, the evidence that the State presented is that that presumption should be applied."

At the close of the hearing, the district court took the matter of immunity under advisement and ultimately denied Drake's motion, finding the State satisfied its burden of establishing probable cause that Drake's use of deadly force against Holladay was not justified under the totality of the circumstances.

*Trial*

At trial, in addition to the witnesses who testified at the preliminary hearing, the State presented testimony from additional police officers and investigators. Drake presented testimony from Misty Thompson and David Shane Williams. He also testified on his own behalf.

Thompson testified that on September 19, 2017—the same day that Drake shot Holladay—as she was getting into her car after work, a man she did not know approached her and asked for a ride. Thompson thought that the man was joking but still told him no. Then, the man started circling her car and tried to put his hand inside of a window that was cracked and also licked the window. Thompson was able to escape the situation and reported the incident to police.

Williams testified he was a patrol officer at the time and was dispatched to the incident involving Thompson. Once at the address provided through dispatch, Williams saw a man that met Thompson's description and identified him as Holladay. Williams testified that he had encountered Holladay on several previous occasions. When Williams approached Holladay, Holladay exhibited abnormal behavior, "using his fingers as finger guns," and also told Williams that "he was high, but he wasn't on a substance."

Stone's testimony at trial was largely consistent with her testimony at the preliminary hearing. At trial however, she testified that before he retrieved the gun, Drake warned Holladay, "if you don't leave the property, then I'm going to shoot you."

Drake testified in his own defense, describing himself and his upbringing. He said he moved into the apartment with Brown in 2016 and that in the summer of 2017, Dupuis moved in too. Drake's cousin also moved in sometime around August 2017. Drake explained that he knew Stone from high school but had just started spending time with her during the two or three weeks before the incident at his apartment.

Describing the events on September 19, Drake testified that when he and Stone arrived at the apartment and confronted Holladay, the feeling was tense and Holladay was "running around [the] house, just picking up everything . . . . He ran into the kitchen, opened all the cabinets looking for his daughter. . . . He was talking about, the cops had been chasing him all day, hurricane people were following him . . . . He was very animated, and very manic." After a while, however, Holladay calmed down and started falling asleep on the couch. Drake and Dupuis used this time to secretly retrieve things out of Holladay's pockets that he had grabbed from their apartment earlier. But Holladay eventually woke up and started acting erratically again. He eventually accused Drake of hiding his child from him.

Drake testified that Holladay grabbed a deck of cards and wanted Drake to watch him do a card trick. Drake, however, felt like this was a "ruse" and that Holladay was going to pretend to do a card trick and then punch him in the face. Drake admitted that, around that time, he texted Dupuis that he was going to shoot Holladay "with the 410, and that it was serious." But he explained his comment was "essentially venting without escalating the situation. I was doing my best to manage and control it." And eventually, Drake "realized" when Holladay was putting his clothes back on, "that was [his] best opportunity to try and shove [Holladay] out of [his] house." The record shows Drake initiated the physical contact with Holladay, by shoving him "as hard as [he] could," in an effort to get him out of the apartment.

Soon after, everyone in the apartment got behind Drake to try and help him push Holladay out. Stone and Brown maced Holladay, which made Drake recognize that Holladay was able to be "hit . . . directly in the eyes, and [it] had no effect on him." As the struggle continued, Holladay started swinging his fist in the doorway and Brown was getting hit in the head with the door. Describing this part of the incident, Drake testified, "I'm seeing out of the corner of my eye my mom getting hit in the head with the door, and the last time, as she's falling to the ground, he immediately punches [Stone] in the face."

According to Drake, at this point in the struggle, Drake yelled at Holladay to "please leave" because he was going to get a pistol. Drake left the room to retrieve the gun, a Glock 9mm. He inserted the clip, chambered a round, and returned to the front room of the apartment. He noticed that Brown was no longer in the room. Drake approached Holladay, who remained in the doorway area. According to Drake, he approached Holladay, pleaded with him again to "please leave" and "gave several warnings." Drake noted that Holladay was not listening or even acknowledging him, so he gave a final warning to leave, saying, "Bryce you have five seconds to leave, or I am going to shoot you." At the time of the warning, Holladay was unarmed, not fighting with anyone, standing near the front door. Dupuis and Stone were also close by, while Brown

9

was not in the room. After delivering the five-second warning, Drake testified that Holladay "looked right at me in my eyes, and he drew his fist back. And I shot him."

*Verdict and Sentencing*

The jury acquitted Drake of first-degree murder but convicted him of the lesser included offense of voluntary manslaughter. Drake's motion for a durational departure was denied, and the district court sentenced him to a prison term of 100 months.

Drake timely appeals.

ANALYSIS

*Did the district court properly deny Drake's motion for immunity?*

Drake's first contention on appeal is that the district court erred by denying his motion for immunity from prosecution under K.S.A. 2017 Supp. 21-5231. This statute immunizes a person from prosecution when the person justifiably uses force to defend a person or a dwelling. Here, Drake argues that he was justified in the use of deadly force based on self-defense or defense of others. K.S.A. 2017 Supp. 21-5222(b) ("A person is justified in the use of deadly force . . . if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."). Drake contends he was likewise justified in his use of deadly force to defend his dwelling. K.S.A. 2017 Supp. 21-5223(b) ("A person is justified in the use of deadly force to prevent or terminate unlawful entry into or attack upon any dwelling . . . if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or another."). In conjunction with his defense immunity claims, Drake asserts he was entitled to the statutory presumption provided in 2017 Supp. K.S.A. 21-5224(a)(1)(A) that he had a reasonable belief that

10

deadly force was necessary to prevent death or great bodily harm because Holladay had unlawfully or forcefully entered Drake's apartment.

*Standard of Review and Basic Legal Principles*

To overcome a defendant's immunity claim under K.S.A. 2017 Supp. 21-5231, the State has the burden to show that an ordinarily prudent and cautious person could reasonably believe the defendant's use of force was not justified under either or both of two scenarios: (1) The defendant did not honestly believe the use of force was necessary under the circumstances; or (2) a reasonable person would not believe the use of force was necessary under the circumstances. *State v. Thomas*, 311 Kan. 403, 412, 462 P.3d 149 (2020). Alternatively, the State may meet its burden of establishing probable cause by showing the defendant acted as the aggressor and provoked the use of force. See K.S.A. 2017 Supp. 21-5226(c).

The probable cause determination contemplated by K.S.A. 2017 Supp. 21-5231 requires a district court to "consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." *State v. Hardy*, 305 Kan. 1001, 1011, 390 P.3d 30 (2017); see also *State v. Collins*, 56 Kan. App. 2d 140, 150, 425 P.3d 630 (2018) ("[T]o overcome a defendant's immunity claim, the State does not need to *prove* that the defendant's use of force was not justified; it merely has to establish probable cause that the defendant's use of force was not justified."), *aff'd* 311 Kan. 418, 461 P.3d 828 (2020).

Appellate courts apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2017 Supp. 21-5231.

11

"When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo." *Hardy*, 305 Kan. 1001, Syl. ¶ 5.

*Overview of the District Court's Findings and Drake's Appellate Claims*

The district court made a brief but thorough review of the evidence. It noted that Drake remained at Riley-Wolf's house for 20-30 minutes after learning Holladay was in his apartment. When he arrived back at his apartment, Drake spent up to 45 minutes trying to convince Holladay to leave. Up to the time of the altercation at the door, Holladay was not armed, was not fighting, and was not engaging in assaultive behavior; at times, he was "nodding off on the sofa." After recounting the text messages in which Drake said he was going to shoot Holladay, the court noted that the messages all preceded any physical altercation. The court pointed out that even though the evidence showed Holladay struck Stone, it did not result in a mark or require medical attention. Finally, the court referenced Drake's statement to police when he was asked why he shot Holladay. Drake said that Holladay had no right to be at the house, was taking stuff, would not leave, and Drake wanted to go to sleep. Drake also stated that he believed Holladay would have left the apartment if police were called, but Drake didn't call the police because he knew Holladay would return to be a problem on another day.

Drake does not challenge the foregoing factual findings made by the district court. Instead, Drake contends the court erred by identifying disputed factual issues and *failing* to explicitly resolve them. He points out that when the district court announced its decision, it indicated that certain disputed facts should be resolved by a jury:

"Under the totality of the circumstances, the court finds that the State has met its burden of proof to show probable cause that the use of deadly force was not justified. The

12

two separate texts that "'I'm going to shoot him in the head,'" with one adding that "'this is no joke,'" before Mr. Holladay was shot and before the altercation at the door began raise a question of premeditation for a jury to decide; the court cannot say as a matter of law that the events described constitute a threat of imminent death or great bodily harm to others.

> "There is a question, also, about Mr. Holladay's condition and his demeanor at the time in question, and the accuracy of perceptions or credibility of witnesses, in light of toxicology reports showing no methamphetamine or any other substance being present in Mr. Holladay's body, and there are disputed facts found in the testimony that need to be resolved by a jury."

The district court also found that Drake believed that Holladay was high on methamphetamine during their encounter, but noted conflicting evidence—the toxicology report—showed that Holladay was not under the influence of any drugs when he died. But the court did not make a factual finding whether Holladay was under the influence. And the court pointed out, but did not explicitly resolve, the conflicting testimony about whether Holladay was invited by Dupuis to come into the apartment or Holladay "simply walked in."

Drake also faults the district court for failing to resolve the issue of whether Drake was entitled to the statutory presumption of reasonableness. Here, he contends the district court

> "omitted material facts such as [Holladay] repeatedly hitting [Brown] with the door, being in a state of rage after he was maced by [Stone and Brown], and being very close to regaining entry into the home when [Drake] shot him. These facts were all relevant to the trial court's duty to resolve the question of whether [Drake] was entitled to a presumption of reasonableness."

By failing to "heed evidence in the record," Drake argues the district court "completely failed" to address Drake's statutory right to the presumption of reasonableness. Although

13

the district court made factual findings supporting its determination, it did not expressly resolve every disputed fact. Drake contends "the trial court failed to perform its gatekeeping function by failing to resolve disputed material facts against either party." We find Drake's argument based on the district court's failure to resolve every disputed fact to be unpersuasive.

*Sufficient Factual Findings Support the Probable Cause Determination*

The district court's ultimate decision reflects and explains the facts that led the court to find probable cause that Drake's actions were not justified, and the district court identified sufficient facts in its ruling to support its legal conclusion regarding the probable cause determination.

We initially note that Drake did not ask the district court for any additional specific factual findings, nor contend the court made inadequate findings required under Supreme Court Rule 165 (2023 Kan. S. Ct. R. 234). See *State v. Steward*, 289 Kan. 715, 720-21, 217 P.3d 443 (2009) (holding counsel shares in the responsibility to ensure the district court makes adequate findings and conclusions in the record and "a litigant who fails to object to inadequate Rule 165 findings and conclusions in the district court is foreclosed from making an appellate argument that would depend upon what is missing"), *overruled on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015). As his argument "depend[s] upon what is missing," from the district court findings, Drake is foreclosed from now challenging the adequacy of the district court findings.

In *State v. Phillips*, 312 Kan. 643, Sy. ¶ 6, 479 P.3d 176 (2021), our Supreme Court explained that when ruling on a defendant's motion for immunity,

"the district court need not make any particularized findings, but it must be apparent from the record that the district court not only recognized but also applied the appropriate legal standard in reaching its probable cause determination. In other words, the record should reflect that the district court considered the totality of the circumstances, weighed the evidence without deference to the State, and resolved conflicting evidence, in arriving at its legal conclusion regarding the probable cause determination."

The record shows that the district court complied with this process. The parties presented disputed evidence, which the district court considered under the totality of the circumstances and weighed without deference to the State, and the district court resolved necessary conflicting evidence before ultimately determining that the State met its burden of establishing probable cause. *Cf. State v. DeLeon*, No. 125,533, 2023 WL 6531080, at *14-15 (Kan. App. 2023) (unpublished opinion) (reviewing facts which reasonable minds could have weighed differently than the district court in deciding to grant self-defense immunity, but ultimately upholding the district court's probable cause finding because the district court adhered to the procedure prescribed by supreme court precedent for deciding immunity claims).

Still, relying on *Phillips*, Drake emphasizes the gatekeeping process contemplated under K.S.A. 2022 Supp. 21-5231 requires a district court to "resolve[] conflicting evidence." He notes that the court did not resolve every factual issue presented at the hearing on his motion. Most notably, Drake claims that the district court failed to resolve the factual disputes related to Holladay's erratic behavior and whether Holladay forced his way into the apartment. Though the district court is tasked with resolving factual disputes, there is no statutory obligation requiring the court to expressly resolve *every* disputed fact, it's task is to *consider* the totality of the circumstances—something the record shows was done by the district court.

Drake's reliance on *Phillips* is somewhat misplaced because the facts of that case are distinguishable from those presented here. In *Phillips*, the trial court made no findings

15

of fact but instead identified several facts that were still in dispute, including whether the defendant was the aggressor and thus unable to assert a self-defense claim. The district court then denied the defendant's motion for immunity based on the existence of the factual disputes identified. 312 Kan. at 656-57 ("[I]n its ruling, the district court merely found that several material questions of fact were in dispute and concluded that this factual dispute precluded immunity.").

Unlike the trial court in Phillips, here the district court identified specific facts which established probable cause that Drake's use of deadly force was not statutorily justified under the subjective and objective tests. See *Thomas*, 311 Kan. 403 at 411. Findings which support the conclusion that Drake's use of deadly force was objectively unreasonable include statements by Drake to police suggesting the decision to kill Holladay was for reasons unrelated to defense of person or dwelling—he wanted Holladay out of the apartment so he could get to sleep. Also, whatever blows that Holladay may have landed on Stone or Brown did not leave any mark or require any medical attention—not the type of blows that suggest any likelihood of imminent death or great bodily harm. Perhaps most significantly, Drake's pre-altercation declarations that he was going to shoot Holladay support the probable cause finding that Holladay was killed for reasons other than defense of persons or a dwelling.

Specific to whether Drake's use of deadly force was subjectively unreasonable, Drake's statement to police that Holladay would have left the premises if police were called also supports the conclusion that deadly force was not necessary—a call to the police would have solved the problem. Drake suggested one of the reasons he did not simply call the police was that he didn't want to have to deal with Holladay on some future date. Other supporting facts include the text messages sent by Drake, which indicate the intent to shoot Holiday well before there was any physical altercation; Holladay was not armed with a weapon and did not cause any visible injury to anyone during his time in the apartment; and in his statement to police, Drake referenced

16

unjustified reasons for shooting Holladay, such as being tired, wanting to go to sleep, and not wanting to deal with Holladay in the future.

Under a totality of the circumstances, both objectively and subjectively, the State's evidence established probable cause that Drake's use of force was not justified, so the district court did not err in determining that Drake was not entitled to immunity under K.S.A. 2017 Supp. 21-5231. We thus find the district court's factual findings support its legal conclusion that the State met its burden of establishing probable cause that Drake's use of deadly force was not justified.

*Appropriate Consideration Given to Statutory Presumption*

As pointed out by Drake, under K.S.A. 2017 Supp. 21-5224(a)(1)(A), "a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm . . . if . . . [t]he person against whom the force is used, at the time the force is used…has unlawfully or forcefully entered, and is present within, the dwelling." In *Hardy*, our Supreme Court held that when ruling on an immunity claim, district courts must consider statutory presumptions when they are factually implicated:

> "Because we have held herein that district courts must 'construe disputed evidence' against one party or the other in order to fulfill its gatekeeping role and give effect to the full scope of the plain meaning of the term 'immune' as used in K.S.A. 2016 Supp. 21-5231, we conclude that district courts must consider the statutory presumptions when they are factually implicated." 305 Kan. at 1013.

Drake claims that the district court wholly failed to consider this presumption of reasonableness under K.S.A. 2017 Supp. 21-5224 when deciding Drake's motion. But the district court clearly considered the statute, as it specifically quoted from the statute during its ruling and discussed the facts surrounding Holladay's initial entry into the

17

apartment. We nevertheless recognize the district court did not make explicit findings about the exact manner of Holladay's entry into Drake's apartment, nor did the court expressly find the statutory presumption was overcome by the State's evidence. However, the core factual prerequisite in the context of the statutory scheme establishing immunity from prosecution is that the person using deadly force must have a reasonable belief that the use of force is necessary to prevent imminent death or great bodily harm. The statutory presumption is simply one of the factors in the "totality of the circumstances" which the trial court is obligated to consider in making its determination. *Hardy*, 305 Kan. at 1011. After reviewing the evidence, the district court was plainly unpersuaded "that the events described constitute a threat of imminent death or great bodily harm to others." And the factual findings made by the district court support the conclusion that Drake did not reasonably believe the use of force was necessary. Thus, we determine that the statutory presumption was not factually implicated because the facts found by the court are expressly inconsistent with the statutory presumption and do not support the conclusion that Drake had a reasonable belief that deadly force was necessary. Stated another way, even if the district court had explicitly determined that Holloway had unlawfully entered Drake's apartment, the district court's other specific findings of fact establish probable cause that Drake was not in actual fear of death or imminent bodily harm to himself or anyone else, overcoming the statutory presumption.

Moreover, we again emphasize that the district court was not required to make particularized findings. See *State v. Nunez*, 313 Kan. 540, 548, 486 P.3d 606 (2021) (confirming that particularized findings are not required when ruling on an immunity motion). Generally, particularized findings are not required when the applicable statue does not call for such findings. See, e.g., *State v. Tafolla*, 315 Kan. 324, 330, 508 P.3d 351 (2022) (confirming that the dispositional departure exception [K.S.A. 2018 Supp. 22-3716(c)(9)(B)] does not require particularized findings and finding no error of law in the district court's decision to bypass graduated sanctions in probation violation case without explicit findings); see also *State v. Gregory*, No. 113,207, 2017 WL 1104475, at *3 (Kan.

18

App. 2017) (unpublished opinion) (withdrawal of plea for "good cause" does not require express findings for all relevant factors). When particularity is not required pursuant to the relevant statutes, implicit findings may be sufficient to uphold a district court's ruling unless a party asks for more definite findings. See *Tafolla*, 315 Kan. at 332 ("If there is no objection, we presume the district court 'found all facts necessary to support its judgment.'"); *State v. Roubideaux-Davis*, No. 125,764, 2023 WL 5662765, at *8 (Kan. App. 2023) (unpublished opinion) (quoting *Tafolla* in determining that implicit findings may be enough to support a district court's decision to revoke probation where a defendant does not object to the sufficiency of the district court's findings); see also *State v. Evans*, 315 Kan. 211, 220, 506 P.3d 260 (2022) (upholding implicit finding regarding credibility of testimony); *State v. Salazar*, 56 Kan. App. 2d 410, 419, 431 P.3d 312 (2018) (upholding implicit finding regarding evidence relevant to "plain view exception" to a search where the implicit finding was supported by substantial competent evidence); *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan. App. 2d 839, 847-48, 21 P.3d 1011 (2001) (upholding implicit findings regarding the duty to defend another for "procedural and substantive reasons"). Thus, if the district court made sufficiently supported implicit findings, reversal is not warranted because Drake did not ask for more specific findings.

We acknowledge that in *Phillips*, our Supreme Court rejected an argument raised by the State that implicit findings alone could provide sufficient support for the denial of an immunity claim. However, the district court in *Phillips* made no factual findings to support its decision to deny the defendant's overall claim and instead relied on the existence of factual disputes as the basis for its decision. See 312 Kan. at 655-658. Here, the district court made sufficient findings to support its probable cause determination. And unlike the argument in *Phillips*, Drake simply challenges the lack of findings specific to the statutory presumption under K.S.A. 2017 Supp. 21-5224. In this regard, Drake tacitly suggests that the district court was required to apply the presumption and thus grant his request for immunity unless it found Holladay did not unlawfully or

19

forcefully enter the apartment when the killing occurred. Under these specific circumstances, we disagree.

The district court's explicit finding that the evidence showed probable cause that Drake's use of force was not justified impliedly shows that the State sufficiently rebutted the statutory presumption. We acknowledge that it is somewhat unclear from our Supreme Court precedent that the presumption under K.S.A. 2022 Supp. 21-5524 is rebuttable. In *Pennington v. State*, No. 108,236, 2013 WL 5507291, at *3, (Kan. App. 2013) (unpublished opinion), this court concluded that the presumption is rebuttable but did so in dicta after determining that the presumption was not triggered by the facts of the defendant's case. Our Supreme Court in *State v. Macomber*, 309 Kan. 907, 924, 441 P.3d 479 (2019), noted that the *Pennington* panel made the finding in dicta and stated that whether the presumption is rebuttable "arguably remains an open question." Still, the *Macomber* court did not specifically find that the presumption is not rebuttable and also noted that refutability "is supportable under the caselaw." 309 Kan. 924 (noting also that Kansas Legislature has specifically drafted certain statutes as requiring "conclusive" presumptions). Here, the State established probable cause that Drake's use of deadly force was not necessary to prevent imminent death or great bodily harm, and we find no statutory intent that the presumption is intended to apply pre-trial when the court has found substantial evidence showing the actual absence of imminent death or great bodily harm. We thus find no reversible error in the district court's consideration of the statutory presumption. *Cf. State v. Trotter*, No. 120,158, 2022 WL 2112212, at*5 (Kan. App.) (unpublished opinion) (holding trial court made findings regarding probable cause and statutory presumptions sufficiently explicit thus making remand unnecessary), *rev. denied* 316 Kan. 763 (2022).

Finally, Drake points to other facts he contends the district court should have relied upon in making its determination. However, the record shows that the district court considered the facts presented by the parties. And our appellate review does not allow us

20

to reweigh the evidence. See *Hardy*, 305 Kan. 1001, Syl. ¶ 5 (appellate court will not reweigh the evidence and will review factual findings for supporting substantial competent evidence only).

*The jury's conclusion that Drake was not entitled to a presumption of immunity is supported by the evidence.*

In his second and final argument, Drake claims that the State presented insufficient evidence to overcome the statutory presumption that his use of deadly force was reasonable under K.S.A. 2017 Supp. 21-5224.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). This is a high standard that requires this court to uphold the verdict unless the evidence "is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020). When reviewing the evidence this court does not assess witness credibility, reweigh evidence, or resolve conflicts in the evidence. *Aguirre*, 313 Kan. at 209.

The district court gave the jury the following instruction on the statutory presumption, an instruction not challenged in this appeal by Drake:

> "You must presume that a person had a reasonable belief that use of physical force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to someone else, if you find the following: One, at the time the force likely to cause death or great bodily harm was used, the individual against whom the force was used was forcefully entering the dwelling of the person using the force.

21

"And two: The person using the force knew or had reason to believe that the individual was forcefully entering the building. This presumption may be overcome if you are persuaded beyond a reasonable doubt that the person did not reasonably believe that the use of force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to someone.

"Bodily harm is any touching of a person against a person's will with physical force in an intentional, hostile, and aggravated manner. The word great distinguishes bodily harm that is slight, trivial, minor, or moderate harm, and as such, it does not include mere bruises."

The State therefore needed to establish beyond a reasonable doubt that Drake did not reasonably believe that the use of force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to someone. Drake primarily emphasizes the lack of consent that Holladay had to be in the apartment and the witnesses' beliefs that Holladay was on drugs or "suffering a mental breakdown, making him violent, unpredictable, and frightening." Drake also notes that Holladay hit Stone in the face with his hand and Brown in the face with the door. He also notes that Stone and Brown used mace on Holladay, but neither that nor the force from the four people attempting to push him out of the apartment succeeded in actually removing him. Drake's argument ignores the limitations of this court's review—we do not assess witness credibility, reweigh evidence, or resolve conflicting evidence. *Aguirre*, 313 Kan. at 209. Additionally, based on our review of the record, Drake's overall claim here is unsupported.

Our analysis of this issue is straightforward. From witness testimony, the jury could conclude that (1) Holladay did not forcefully enter the apartment, he was invited in; (2) Holladay was never outside the apartment after he was permitted to enter until after he was shot and fell outside; (3) Holladay was not forcefully entering the apartment at the time he was shot by Drake—he was standing in the entry, refusing to leave; and (4)

22

evidence shows Drake did not reasonably believe his use of force was necessary to prevent imminent death or great bodily harm to anyone.

The State correctly notes that although Holladay may have hit Stone and Brown, they sustained no visible injuries. Also, unlike Drake, Stone, and Brown—who had a gun, mace, and a baseball bat—Holladay did not have a weapon. Additionally, the State's toxicology report refuted the witnesses' claims that Holladay was high on drugs at the time of the shooting. Holladay also remained in the apartment with Dupuis for more than an hour without engaging in any physical altercation by the time Drake arrived. Also, based on the approximate time that Drake arrived at the apartment and the time that emergency dispatch sent police to the apartment, Drake and Holladay stayed in the apartment for around an hour before things escalated to a physical altercation. The physical altercation was initiated by Drake when he tried pushing Holladay out of the apartment.

As recounted earlier in this opinion, Drake's text messages and statements to police support the jury's determination that Drake was not justified in his use of deadly force. Evaluating the evidence in a light most favorable to the State, as we must, we find the evidence is sufficient to overcome any statutory presumption that Drake was justified in his use of deadly force.

Affirmed.